**Claude SPENCE, Plaintiff,**

v.

**LOCAL 1250, UNITED AUTO WORKERS OF AMERICA, Defendant.**

**Civ. A. No. C82–2095.**

United States District Court,
N.D. Ohio, E.D.

March 29, 1984.

Michael M. Djorkjevic, Smith & Smith, Avon Lake, Ohio, for plaintiff.

Thomas G. Kelley, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Claude Spence, a white man, claims his former employer, Local 1250 of the United Auto Workers of America ("Local"), wrongfully discharged him in retaliation for Spence's opposition to what he believed were discriminatory practices directed toward a black fellow employee.

Jurisdiction is proper pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The case was tried to the Court on February 21–22, 1984. Upon consideration, the Court renders judgment in favor of the plaintiff and issues the following findings of fact and conclusions of law, pursuant to Fed.R. Civ.P. 52.

## FINDINGS OF FACT

Claude Spence worked as a janitor for Local 1250 from October of 1977 until June of 1981. He was fired because he spoke out against practices which he felt evidenced that the Local was discriminating against a fellow employee, who was black. Although Spence was not fired until about a year and a half after he voiced his opinions, and although the Local claimed he was fired for failing to perform his duties, the facts demonstrate that Spence was actually discharged in retaliation for publicly repeating what Local officials had told him when he was hired:

> ... they [the Local officials] told me [Spence] if they could get rid of this nigger, I would make a lot of money because he had made a lot of money for this Local.

\* \* \* \* \* \*

> Now, several times he said that if he could get rid of this nigger Floyd Blackwell, the other custodian, that I could make a lot of money for the Local.

\* \* \* \* \* \*

> I came in and talked to Don Talley and he put me to work in order to get rid of Floyd Blackwell.

\* \* \* \* \* \*

During his employment with Local 1250, Spence was not a member of Local 1250 or any other union. His job entailed cleaning and maintaining the Local's union hall, a duty he shared equally with another janitor employed by the Local, Floyd Blackwell, a black man. Blackwell began working for the Local in 1955 and, at the time of Spence's hire, was in poor health and was solely responsible for cleaning the union hall. Spence was hired to help Blackwell, at the urging of Donald Talley, a member of Local 1250's executive board. Talley subsequently became responsible for supervising the janitors. Donald Talley and Claude Spence became friends and, at the time Spence was hired, Talley told Spence that he "wanted to get rid of the nigger" and he urged Spence to harass Blackwell on the job. Spence acquiesced and, for a period of time, frequently argued with Blackwell and reported him whenever he missed time from work.

As time went on, Blackwell's health deteriorated and Spence had a change of heart which prompted him to stop harassing Blackwell. In December of 1979, Blackwell enlisted Spence's help in a dispute Blackwell had with the Local over pension benefits. While a court stenographer took down his words, Spence recounted his conversations with Talley.[1]

Spence made his statement in an office in the building where he and Blackwell worked. There were no attorneys present, only Spence and Blackwell and three other Local officers. Spence made the statement to show that Blackwell had been called a "nigger" and Spence had been told he was hired in order to get rid of Blackwell, statements which Spence believed indicated that Blackwell was the target of discrimination.

Spence's statement was subsequently transcribed and duplicated. Thousands of copies were distributed throughout the Ford factory where the members of Local 1250 were employed. Subsequently, Talley altered the janitor's working conditions and required, among other things, that they work a seven day week. Talley also sued Spence in Common Pleas Court for alleged libel and slander. Judgment was later entered in Spence's favor. In August of 1980, Spence wrote to Douglas Frazier,

---

1. The full text of Spence's sworn statement is as follows:

MR. SPENCE: I was hired here in October of 1977.

Don Talley and Tony Fransetta talked with me here in this office and at the time that I was hired, they told me if they could get rid of this nigger, I would make a lot of money because he had made a lot of money for this Local.

I worked until June of 1978 and was laid off.

When I was laid off, then I asked if I could work night shift; I asked for night shift premium which they paid me.

I was laid off until March of 1978—I was recalled.

When I was recalled, Don Talley said that he was the one that recalled me because Thurman Payne had told him to call me back.

Back in 1977, I went to Don's house and buffed his floors on Saturday mornings; I was supposed to be working here. I did the floors with the new buffer, and later on I went to his girlfriend's house over off of Lorain and did electrical work for Don while I was being paid from the Local.

Then, I used to drink with Don at night when I should have been working here, and I knew it.

So, about four months ago I was caught cutting a piece of carpeting off of the stage back here and was measuring the stage for Don. Then Art Kuhns caught me and said that they were trying to say that Thurman was getting kick-backs on the carpeting that they had bought.

Since then they have docked me a Saturday and a Sunday and have used Floyd in trying to get back at me when he was trying to use me to get Floyd for the last three years.

I can't remember, but Thurman and I, we had a conversation with Talley in order to get my check. He had to write my check up and refused to pay me until he talked to me.

He said that Floyd was trying to use me to win a suit that he had against this Local.

The things that I did—see, we worked—we came in when we wanted to, did our work and would leave. There had never been any question about it until Talley brought this up.

Now, several times he said that if he could get rid of this nigger' Floyd Blackwell, the other custodian, that I could make a lot of money for the Local.

Now, in me making this statement, I am putting my job on the line, you know, because they are trying to get rid of Floyd and myself.

Now Don even brought letters to the Board, sent letters into the Executive Board to get rid of us and to get an outside concern in here.

I don't know whether they will lay me off or what knowing that I made a statement. They may come over and try to beat the hell out of me; I don't know what the hell they are trying to do.

But it's all the truth that I have said, and that is all that I know that I can say.

I know that Don has told me—I know that I told him that Floyd was bitching because he was doing all the work here and he said that he could only go to the Board and him and he controlled both. So, that is all that I know that I can say.

When I drank with Don and did the work for him, he knew that I was supposed to have been here. And like I say, I buffed his floors; that was at his girlfriend's house and I did electrical work at his girlfriend's house.

He knew that I was supposed to have been working, but he controlled the Board and so everything was all right like that.

I guess that is all that I can say on that.

In closing, I heard that there was an opening for a custodian here at the Local. I came in and talked to Don Talley and he put me to work in order to get rid of Floyd Blackwell. That is it.

Incidentally, I didn't have to fill out an application for the job, I was put to work.

president of Local 1250's International Union, complaining about the harsh treatment he was receiving.

In June of 1981, the Local's executive board called a meeting despite the fact that its president and recording secretary, two important board members who were generally not excluded from meetings, were known to be out of town and unable to attend. It was highly unusual for the board to call a meeting without either of those two officers; it was especially unusual to deliberately proceed without both of them. This particular executive board was meeting for the last time because a union election had recently taken place and a new slate of officers had been elected. At the meeting, the attending members moved and unanimously voted to terminate Spence effective June 4, 1981.

Although Spence and Blackwell were equally responsible for maintenance of the union hall, Blackwell was not similarly discharged or even disciplined. Blackwell remained employed until later in 1981 when he voluntarily stopped working after his health worsened. He died a few months later.

Spence challenged his firing before the Equal Employment Opportunity Commission and filed the instant suit.

## CONCLUSIONS OF LAW

Spence's action is based on § 704(a) of Title VII of the Civil Rights Act of 1964, codified as 42 U.S.C. § 2000e–3(a). The section, also known as the "participation and opposition clauses" states in pertinent part:

... It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Local 1250 contends that Spence has failed to state a claim under § 2000e–3(a) for two reasons. It alleges that 1) Spence has not established that Blackwell was in fact discriminated against by the Local; and 2) there is no evidence that Blackwell's suit against the Local invoked the protection of Title VII. The Local's arguments misstate the law.

I.

■ An employee need not establish the validity of his original discrimination claim to prove a charge of employer retaliation flowing from the original claim. *Croushorn v. Board of Trustees of the University of Tennessee*, 518 F.Supp. 9, 21 (M.D. Tenn.1980). Rather, the factual truth of the employee's accusation which inspired the reprisal is immaterial. 3 Larson, *Employment Practices*, § 87.40 (1983). What is relevant is that the employee sincerely believed discriminatory practices existed. It is no defense that the employee's accusation was factually incorrect. *Id.*

■ The evidence clearly indicates Spence sincerely believed Blackwell was being discriminated against because he was black. The fact that Talley called Blackwell a "nigger" and told Spence he was being hired to "get rid of the nigger" is undisputed. Indeed, collateral estoppel precludes this Court from finding to the contrary.[2] Spence testified that he be-

---

**2.** In *Talley v. Spence*, No. 08609 (Cuyahoga Cty. C.P. January 20, 1982) Judge Kilbane specifically found that "[Spence's] statement wherein he quotes [Talley] as using the term 'nigger' is true." The parties in this case are identical to the Common Pleas action, insofar as Talley, the plaintiff in the libel suit, is also one of the board members through whom the defendant in this action, the Local, acted.

... Where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

*Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125, 128 (6th Cir.1971).

lieved Talley's references to Blackwell as "nigger" was evidence of discrimination. This Court need not determine whether Spence correctly assessed the significance of Talley's disparaging remarks; it is enough that Spence believed Blackwell was the target of discrimination. Talley's remarks combined with the Local's refusal to allow Blackwell a pension[3] convinced Spence that there was racial discrimination. Spence need not prove the existence of discrimination.

## II.

■ Spence need not establish that Blackwell's suit against the Local involved Title VII, contrary to the Local's arguments. Its contention that § 2000e–3(a) is limited to employer retaliation for invoking Title VII enforcement machinery is not supported by the statutory language. *Garcia v. Rush Presbyterian-St. Luke's Medical Center*, 80 F.R.D. 254, 262 (N.D. Ill.1978). The fact that neither Spence nor Blackwell actually filed charges under Title VII or testified in a proceeding brought under the Civil Rights act is irrelevant. Opposition to discriminatory practices can take a wide variety of forms, and is not limited to the filing of charges. *See, e.g., Garcia, supra; Green v. McDonnell Douglas Corp.*, 463 F.2d 337, 341 (8th Cir. 1972), *rev'd on other grounds*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Wilson v. Willowbrook, Inc.*, 433 F.Supp. 321 (N.D.Tex.1977) *aff'd without opinion*, 569 F.2d 1154 (5th Cir.1978). This Court concludes that Spence's statement, made in an attempt to help a fellow employee successfully prosecute his claim for pension benefits which were being withheld, was a protected activity. It is irrelevant that Spence did not testify in Blackwell's suit, or that Blackwell's attorney was not present when Spence made his statement. Spence was not familiar with the procedural niceties of deposition-taking and cannot be faulted for being unaware of the irregularities to which the Local attaches such significance. The only significant fact is whether Spence's statement was protected activity under § 2000e–3(a). This Court concludes that it was.

■ The statute protects two types of activity. "Opposition" is protected by the clause that forbids employers from discriminating against an employee because he has opposed an unlawful discriminatory employment practice. "Participation" is protected by the clause prohibiting discrimination against an employee for making a charge, testifying, assisting or participating in any way in a proceeding brought under Title VII. *Croushorn, supra* at 21. In this case, Spence's statement is not protected under the "participation" clause, rather, it is covered by the "opposition" clause. Spence's statement is analogous to the "communication which [itself] becomes a form of opposing the perceived unlawful employment practice and should in some circumstances be protected only under the opposition clause." *Id.* at 21 n. 11. The *Croushorn* court advises that the intent of the employee and the motivation of the employer should control the outcome. *Ibid.*

## III.

■ To prevail in his Title VII suit, Spence must meet the burden of proof first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Brooks v. Ashtabula County Welfare Department*, 717 F.2d 263 (6th Cir.1983).

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden,

---

**3.** The evidence indicated that, after Blackwell filed his suit against the Local, it reversed its position and awarded Blackwell a pension which is now being paid to his widow.

the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine, supra* 450 U.S. at 252–253, 101 S.Ct. at 1093 (citations omitted). In a retaliation suit under § 2000e–3(a), seven elements of proof have been identified as necessary to establish a *prima facie* case.

... plaintiff must show (1) that he belonged to the class protected by Title VII; (2) that he was qualified for the position that he sought or that he held at the time of the retaliation; (3) that he engaged in an activity protected by 42 U.S.C. § 2000e–3(a); (4) that the employer knew that plaintiff engaged in such an activity; (5) that subsequently plaintiff was discharged or subjected to other damage; (6) that the employer acted with a retaliatory motive; and (7) that at the time of the retaliation the employer had no intention to eliminate the position that plaintiff sought or held.

*Croushorn, supra* at 19. (footnote omitted).

### A. *Prima Facie Case*

 Although Spence is a white male, it is clear that he is protected by § 2000e–3(a). The section extends protection to all persons engaged in protected activities, regardless of their race or sex. *Eichman v. Indiana State University Board of Trustees,* 597 F.2d 1104 (7th Cir.1979). It is undisputed that Spence was qualified for the janitor's job he held prior to his termination. As indicated above, Spence's statement exposing and opposing the manner in which Blackwell was treated by the Local is a protected activity under the statute. There can be no doubt that the Local officers were aware of Spence's statement. Copies of it were distributed throughout the Ford plant where the Local officers worked; Talley was so aware of it that he filed a libel suit against Spence for making the statement. Spence's working conditions were altered after the statement and he was eventually fired. Thurman Paine, the Local's president at the time of Spence's firing, unequivocally testified that Spence was fired in retaliation for his remarks about Blackwell and the Local. The parties do not dispute that the last element of Spence's *prima facie* test is satisfied by the Local's admission that it currently employs two blacks as janitors. This Court concludes that Spence has established a *prima facie* case of retaliatory discrimination.

### B. *Articulated Non-Discriminatory Reason*

To articulate its legitimate non-discriminatory reason for Spence's discharge, the Local refers to the minutes of the June 2, 1981 meeting which indicate Spence was "terminated as of June 4, 1981 due to not doing his job." The Local's evidence that Spence was remiss in his duties came from James Patterson, a board member who reported in his audits that the union hall was not clean. Since Spence was not represented by any union, or protected by the terms of a written contract, it appears the Local need do nothing more to justify Spence's discharge.

### C. *Pretext*

Spence produced persuasive evidence that Local 1250's reason for firing him was no more than pretext. Although both Spence and Blackwell were equally responsible for the maintenance of the union hall and were similarly situated, only Spence was discharged because the hall was not clean. However, there was no evidence that the hall's allegedly unsatisfactory condition was attributable to Spence's neglect rather than Blackwell's or Blackwell's and Spence's joint neglect. To the contrary, Calvin Lewis, Howard Hall, Georgia Breeden and Thurmon Paine all testified that they saw Spence working hard and doing an admirable job to keep the hall clean and properly maintained.

Calvin Lewis, who had previously worked with Blackwell and was therefore familiar with the job, testified that Spence not only

performed his own duties conscientiously, but also did Blackwell's share of the work. Breeden, who, as Paine's assistant, was responsible for screening complaints directed to Paine and the Local's executive board, testified that she never screened any complaints about Spence's working habits. Moreover, she personally observed Spence working "til the sweat rolled". Howard Hall said he saw Spence on many occasions "stripped to the waist, sweaty and wet from working so hard" while doing his own work as well as Blackwell's because Blackwell was "too sick to work". These union officials' testimony is far more credible than James Patterson's recollection of his audit reports juxtaposed with his admission that he wasn't familiar with Spence's work. There was not a scintilla of evidence that Spence was derelict in his duties.[4]

Thurmon Paine unequivocally testified that, as president of the Local during the relevant time period, he knew efforts were being made to fire Spence in retaliation for his statement. This Court credits Paine's testimony that, although it took nearly a year and a half to accomplish, Spence's firing was done in retribution for his statement.

Absolutely unconvincing is Huck Granakis' assertion that he was unfamiliar with Spence's statement and it played no part in his decision to second the motion to terminate Spence. Granakis' testimony is incredible in light of the evidence that thousands of copies of Spence's statement were circulated among Local 1250 members. Equally flimsy is the Local's explanation that Blackwell was treated differently than Spence only because the Local felt more charitable toward him because of his long years of service and poor health. The Local, however, does not have a history of treating Blackwell charitably and it stretches this Court's imagination to give the Local credit for such magnanimity after it denied Blackwell his pension and en-

couraged employees to harass him. It is much more plausible that the disparity between Spence's and Blackwell's treatment is attributable to the Local official's desire to visit revenge on Spence for exposing its racism, rather than on some noble desire to give Blackwell a break. This Court concludes that the Local's articulated reason for Spence's termination is pure pretext and the real reason for Spence's dismissal was his outspoken opposition to employment practices which he felt indicated a pattern of discrimination against a black employee.

## IV. DAMAGES

Title 42 U.S.C. § 2000e–5(g) provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay ...

Section 2000e–5(g) arms the courts with full equitable powers to carry out Title VII's purpose of making persons whole for injuries suffered as a result of illegal employment discrimination. *See, Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The *Albemarle* court held that, in Title VII cases involving racial discrimination,

... the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.

*Id.* (citations omitted). It is clear that Spence is entitled to reinstatement pursuant to § 2000e–5(g) and this court has a

---

4. The only conceivable indications of misconduct were Spence's own admissions, in his statement, that he went drinking with Talley and did work at Talley's home on union time. However, Talley admitted in open court that Spence was never disciplined for these acts and it was not a consideration in the decision to fire Spence.

duty to make him whole by ordering Local 1250 to reemploy him. Spence also asks for an award of lost wages. An award of backpay is generally appropriate to compensate an employee whose employer has violated Title VII. *Ibid.* Backpay consists of lost or unpaid wages or salary which an employee would have earned but for the discriminatory discharge. Accordingly, this Court orders Local 1250 to compensate Spence for backpay to which he is entitled.

The parties are to submit affidavits indicating what amounts Spence would have earned from June 1, 1981 to the present and the value of any benefits to which he would have been entitled during that period. The parties are also to submit affidavits indicating what deductible earnings Spence received during that period which must be subtracted from the calculation of backpay.

Spence also seeks an award of attorney fees to which he is entitled under 42 U.S.C. § 2000e–5(k). Spence's attorney is directed to submit a request for attorney fees in conformance with the guidelines delineated in *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

IT IS SO ORDERED.