578 A.2d 766

**Robert L. CHAPPELL**

v.

**SOUTHERN MARYLAND HOSPITAL, INC., et al.**

**No. 148 Sept. Term, 1989.**

Court of Appeals of Maryland.

Sept. 5, 1990.

**484**

Nathan I. Finkelstein (Kathleen T. Barlow, Deso & Greenberg, P.C., all on brief) Washington, D.C., for appellant.

Leslie Robert Stellman (John W. Kyle, Littler, Mendelson, Fastiff & Tichy of Baltimore, John F.X. Costello, Landover, all on brief), for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and ADKINS,* Associate Judge of the Court of Appeals (retired), Specially Assigned.

MURPHY, Chief Judge.

In *Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981), we recognized that a tort action for abusive or wrongful discharge of an at-will employee could in a proper case arise in Maryland "when the motivation for the discharge contravenes some clear mandate of public policy." The case now before us involves an action filed by Robert L. Chappell against the Southern Maryland Hospital (SMH) to recover compensatory and punitive damages for his alleged "unjust discharge" from employment as Director of Personnel at SMH.

The complaint was filed on November 23, 1988 in the Circuit Court for Prince George's County. It recited that Chappell was employed by SMH on an at-will basis from July 24, 1984 to December 17, 1985; that he was responsible for implementing all employment-related policies of SMH; that Francis Chiaramonte was Chief Executive Officer and Sebastian Suriani was Chief Operating Officer at SMH; and that during his employment, he discovered personnel prac-

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

tices. which he believed to be unlawful under state and federal employment laws. Specifically, Chappell alleged in his complaint that a black male housekeeping supervisor was sexually harassing several of his black female employees, that SMH was violating state and federal wage and hour laws, and that racially discriminatory practices existed in the employment of blacks at SMH. The complaint further stated that Chappell "on numerous occasions, utilizing the chain of command within the Hospital, attempted to advise the top management of the hospital, including Francis Chiaramonte and Sebastian Suriani, as to these illegal practices and policies"; that "after diligent efforts on his part to apprise top management of the problems, to suggest solutions, and to correct the illegal discriminatory practices and violations of public policies which existed, no action was taken"; that, thereafter, he proceeded to document in memorandum form the serious violations within the hospital and sent these memoranda directly to Suriani and Chiaramonte; that following his "exposure" of these practices to both Suriani and Chiaramonte it became clear to him "that he was being set up for dismissal from the Hospital"; that he was advised by his immediate supervisor "that it appeared that he would be set up for termination as a result of the action on his part"; that he (Chappell) "discussed these problems with counsel for the Hospital on several occasions and was advised that his assessment of the situation was correct, but that it was doubtful that any action would be taken"; that he was "wrongly accused" by Suriani and Chiaramonte "of activities on his part"; and "was also being criticized for things which either were untrue or which had never been a basis for criticism in the past." The complaint further alleged that on December 17, 1985, Chappell's employment with SMH was terminated; that prior to his termination, he was not advised that his job was in jeopardy, nor was he advised "that he was conducting himself in a fashion which was unacceptable to the Hospital"; that "in August 1985, just four months prior to his termination, he received an excellent evaluation with mini-

mal criticisms of his performance"; and that "at the time of his termination, he was not advised as to any reason why he was being terminated."

Chappell alleged that his discharge was wrongful in that it was caused by "his insistence that the Hospital abide by the clear letter and spirit of the laws of the United States and the State of Maryland, particularly, that the Hospital must cease its policy of discriminating against Blacks in its hiring, that the Hospital must fully investigate and cease the sexual harassment situation which existed toward female employees within the Hospital, and that the Hospital must cease its illegal policy regarding wage and hour laws." Chappell claimed damages, compensatory and punitive, in the total amount of $600,000.

SMH moved to dismiss Chappell's complaint under Maryland Rule 2–322 for failure to state a claim upon which relief could be granted. In a supporting memorandum, SMH conceded that employment discrimination on the basis of race, and violations of state and federal wage and hour laws, may contravene the public policy of this State. But it did not follow, SMH maintained, that Chappell's discharge from his employment for bringing these alleged violations to the attention of upper management also violated the state's public policy, warranting a tort action under *Adler* for wrongful discharge. SMH recited that *Adler* concerned an at-will management employee whose tort complaint was that he was discharged as a result of his effort to inform upper management of various violations of the criminal laws of Maryland, *i.e.*, corporate improprieties, including commercial bribery, falsification of corporate records and financial data. While acknowledging that *Adler* sanctioned a tort action for wrongful discharge in a proper case, SMH argued that our holding in that case was that Adler's complaint did not state a cause of action because he failed to sufficiently allege that his discharge violated any legislative enactment, judicial decisions or state regulations; and hence did not constitute a violation of the state's public policy. SMH further alleged, in support of its motion to dismiss, that Chappell's complaint asserted no more than

that the hospital was displeased that Chappell, as a management employee, would raise allegations of unlawful conduct by the hospital and therefore discharged him. A discharge for this reason, SMH argued, did not contravene any specific provision of Maryland public policy and consequently would not support a tort action for wrongful discharge.

As a separate ground for dismissal of Chappell's complaint, SMH contended that a tort action for wrongful discharge could in no event be brought because exclusive statutory remedies existed to vindicate the violations of Maryland public policy alleged in Chappell's complaint. As to the racial discrimination allegations, SMH pointed to the Maryland Fair Employment Practices Law which prohibits employment discrimination based upon sex and race, Maryland Code (1957, 1986 Repl.Vol.), Article 49B, §§ 14–18. As to the alleged wage and hour violations, SMH noted that they are proscribed by the Maryland Minimum Wage Act, Code (1957, 1985 Repl.Vol.), Article 100, §§ 81–93A. In particular, SMH claimed that Chappell, as a management employee, was specifically excluded by § 82(e)(2) from the protections afforded by the statute and therefore no public policy considerations were implicated as to this component of Chappell's complaint. Thus, SMH suggested that because Chappell was excluded from the statute's coverage, his discharge did not violate any provision of Maryland public policy.

At a hearing on June 21, 1989, the court (Ahalt, J.) granted SMH's motion to dismiss. In concluding that the facts alleged in Chappell's complaint "do not fall within the four corners of *Adler*," the court said it adopted the "reason set forth in the Defendant's memorandum."

Upon Chappell's appeal to the Court of Special Appeals, we granted certiorari prior to argument in that court to consider the important issues raised in the case.

I.

Our recognition of the tort of wrongful discharge in *Adler* was predicated on the discharge of an at-will employ-

ee, in contravention of some clear mandate of the public policy of Maryland, for refusal "to act in an unlawful manner or [because the employee] attempted to perform a statutorily prescribed duty." 291 Md. at 42, 432 A.2d 464. We said that the determination whether the discharge was tortious or legally permissible "depends in large part on whether the public policy allegedly violated is sufficiently clear to provide the basis for a tort ... action." *Id.* As to this, we indicated that the declaration of the public policy of the state is normally the function of the legislative branch, although public policy may also be found in prior judicial decisions or administrative regulations.

Adler, an assistant general manager of a corporation's commercial printing division, alleged in his tort suit for wrongful discharge that he uncovered illegal practices regarding his employer's accounting and tax reporting, in addition to commercial bribery. He further alleged that he disclosed these observations to his supervisor and made recommendations respecting their correction. Thereafter, the employee said he was discharged for what he believed was an improperly motivated action precipitated by his refusal to conceal or participate in the corporation's alleged illegal practices. Accepting these averments of the complaint as being true, we determined that they were too vague and conclusory to state a cause of action for wrongful discharge because they failed to provide "a sufficient factual predicate for determining whether any declared mandate of public policy was violated." *Id.* at 46, 432 A.2d 464. Specifically, we noted that Adler did not identify statutory provisions that particularly prohibited the claimed misconduct in violation of the state's public policy.

*Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), decided eight years after *Adler*, and a month after the circuit court's judgment in the present case, involved an at-will employee at a paint factory. Within a two-month period of discovering that she was pregnant, she was discharged. Her employer stated that " 'she could not work at her job as long as she was pregnant' and 'that her

pay and her medical benefits would stop until she became disabled because of her pregnancy.' " *Id.* at 605, 561 A.2d 179. Subsequently, she filed a complaint with the Federal Equal Employment Opportunity Commission (EEOC); that agency determined that there was not "reasonable cause" to believe that Makovi was the victim of sex discrimination. It thereafter notified her of a right to bring an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1982).[1] She instead filed a tort action for abusive discharge in the Circuit Court for Baltimore City, alleging that her dismissal from employment was based upon sex discrimination in violation of the federal law and the Maryland Fair Employment Practices Law, Article 49B, §§ 14–18. We held that the tort of abusive discharge will not lie where the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy. *Id.* at 609, 561 A.2d 179. We noted that § 2000e–5(g) of Title VII sets forth, as remedies for unlawful sex discrimination, the enjoining of the unlawful employment practice, and "order[ing] such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate." We further noted in *Makovi,* 316 Md. at 607–08, 561 A.2d 179, that the Maryland statute, Article 49B, § 11(e), provided

---

1. As discussed in *Makovi, supra,* 316 Md. at 606–07, 561 A.2d 179, Title VII provides a statutory scheme whereby victims of employment discrimination based on race, color, religion, sex, or national origin can obtain appropriate relief. Section 2000e–2(a) of the statute makes it unlawful for an employer:

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

substantially the same remedy for such an unlawful employment practice.[2]   We concluded that because Title VII and the Maryland statute provided a remedy for Makovi's alleged employment discrimination, *e.g.*, reinstatement with back pay, "the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, [did] not apply." *Id.* at 626, 561 A.2d 179.

## II.

Chappell argues before us, notwithstanding our holding in *Makovi*, that employment practices that tend to violate the Maryland Fair Employment Practices Law and the Maryland Minimum Wage Act are within the scope of the mandate in *Adler*.   He claims that *Makovi* is not applicable because in that case the plaintiff, who was discharged because of her pregnancy, had available to her a statutory remedy under Article 49B, § 11(e).   Chappell asserts that he has not alleged that SMH discriminated against him on the basis of sex or race, or violated his rights under the state wage and hour laws; rather, he says that his discharge was prompted by his employer's dissatisfaction with his questioning of SMH's claimed violations of Maryland employment laws.   Thus, he states that his "status," *i.e.*, sex, race, etc., was not the reason for his discharge, but rather it was his conduct in identifying problems within SMH which gave rise to his termination.   He thereby seeks to distinguish his case from *Makovi*, suggesting that because he was not discriminated against on the basis of his

---

**2.**   This section provides, in pertinent part:
"If the respondent is found to have engaged in or to be engaging in an unlawful employment practice charged in the complaint, the remedy may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief that is deemed appropriate.   The award of monetary relief shall be limited to a 30–month period, except that such 30–month period shall not apply to losses incurred between the time of the Commission's final determination and the final determination by the circuit court or higher appellate court, as the case may be."

status, as was the employee in *Makovi*, the anti-discrimination statutes, *i.e.*, Title VII and the Maryland Fair Employment Practices Law, are not applicable. Chappell further argues that the available statutory remedies are inadequate and unacceptable to his particular injury, and therefore, the tort of abusive discharge must be invoked to fully compensate him by way of compensatory and punitive damages.

### III.

[1] The Maryland Fair Employment Practices Law was enacted in 1965 to ensure equal opportunity employment throughout the State. The Maryland Commission on Human Relations is the administrative agency charged with enforcing the provisions of the statute. Section 14 of the Act provides that it is the public policy of the State "to assure all persons equal opportunity in receiving employment and in all labor management-union relations regardless of race, color, religion, ancestry or national origin, sex, age, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents." Section 16 defines "unlawful employment practices" by an employer in terms closely tracking the language of the federal act. Relevant to this case are §§ 16(a) and 16(f), which state, respectively:

"(a) It shall be an unlawful employment practice for an employer:

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

(2) To limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of the individual's race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment;

\* \* \* \* \* \*

(f) It is an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subtitle or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle."

The Maryland Minimum Wage Act also was enacted in 1965 to "establish minimum wage compensation standards in the State ... to provide a maintenance level consistent with the needs of the population for their health, efficiency and general well-being." Article 100, § 81. Section 83 sets forth minimum wages, overtime rates and exemptions according to job classifications.

As earlier observed, we said in *Makovi* that "[a]busive discharge is inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." 316 Md. at 605, 561 A.2d 179. Because Chappell has available to him a civil remedy under both federal and state law, provided he meets his burden of proof, this case is governed by the principles of *Makovi*, which preclude application of a tort remedy to his discharge from employment.

Section 2000e–3(a) of the Civil Rights Act, like § 16(f) of Article 49B, makes it unlawful for an employer to discriminate against any employee either "because he has opposed any practice made an unlawful employment practice" under Title VII (the opposition clause), or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII (the participation clause).[3] In the absence of legislative intent to the contrary, we read § 16(f) of the state act in harmony with § 2000e–3(a) of the federal statute, and therefore construe the two provisions to fulfill the same objectives. In this regard, we may look to court decisions interpreting § 2000e–3(a).

The opposition and participation clauses of § 2000e–3(a) have been liberally applied by the courts to shield employees who speak out against an employer's unlawful employment practices, the obvious rationale being that without some guaranteed protection to assert equal employment rights, the ultimate purpose of the act would be severely limited. *See, e.g., E.E.O.C. v. Crown Zellerbach Corp.,* 720 F.2d 1008 (9th Cir.1983) (a letter protesting unspecified "racism" and "discrimination" in employer's practices is a permissible form of protected opposition to discriminatory practices); *Armstrong v. Index Journal Co.,* 647 F.2d 441 (4th Cir.1981) (female employee who was discharged because she complained to her employer about its discriminatory practices of soliciting applicants for sales work according to their sex, and by limiting the job opportunities and

---

3. This section provides:
"It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

base pay of its female salespersons, was entitled to reinstatement with back pay and salary equal to male counterparts, court costs and attorney's fees); *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir.1980) ("By protecting employees from retaliation, [§ 2000e–3(a) ] is designed to encourage employees to call to their employers' attention discriminatory practices of which the employer may be unaware or which might result in protracted litigation to determine their legality if they are not voluntarily changed."); *Eichman v. Ind. State Univ. Bd. of Trustees*, 597 F.2d 1104 (7th Cir.1979) (plaintiff who alleged that he assisted a woman who was trying to exercise her Title VII rights to retain her job, and that his discharge was in retaliation for that assistance, sufficiently states a claim under § 2000e–3(a)); *Jones v. Lyng*, 669 F.Supp. 1108, 1121 (D.D.C.1986) ("The 'opposition clause' protects statements by a person ... who is not himself the direct victim of the discriminatory practice but who opposes such discrimination against others."); *Jenkins v. Orkin Exterminating Co., Inc.*, 646 F.Supp. 1274 (E.D.Tex.1986) (employee who was terminated for telephoning district manager to complain on behalf of another employee he believed to be experiencing sexual harassment was protected under the opposition clause of § 2000e–3(a)); *Crockwell v. Blackmon–Mooring Steamatic, Inc.*, 627 F.Supp. 800 (W.D.Tenn.1985) (plaintiff demonstrated a prima facie case of retaliatory discharge under § 2000e–3(a) by showing that her stated objections to her employer regarding sexual harassment of a co-worker most likely prompted her discharge); and *Spence v. Local 1250, United Auto Workers*, 595 F.Supp. 6 (N.D.Ohio 1984) (employee who was fired for speaking out against his employer's practices, which he believed to be racially discriminatory against a fellow employee, was participating in protected activity under § 2000e–3(a)).

■■■ We need not decide whether Chappell's complaint, as now framed, would present a cognizable claim under the federal or state anti-discrimination statutes. We note, however, that under the authorities, to prove a prima facie

retaliation case under § 2000e–3(a) requires a showing (1) that there was a statutorily protected "opposition" or "participation"; (2) that an adverse employment action occurred; and (3) that there was a causal link between the protected activity and the adverse employment action. *See, e.g., Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989); and *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). As the Maryland statute tracks the language of § 2000e–3(a), we think it likely that these same criteria would determine whether a prima facie violation of the state law was established. In any event, it is clear that Chappell can pursue a remedy under both the state and federal anti-discrimination statutes for his discharge from employment for apprising his employer of allegedly discriminatory employment practices.[4]

We reach a similar conclusion with regard to Chappell's claim that he was discharged in retaliation for reporting unspecified violations of state and federal minimum wage laws. Section 215(a)(3) of the Federal Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* (1978), makes it unlawful

> "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

Remedies available under § 216(b) of the FLSA include "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title,

---

4. Chappell can bring all of his employment discrimination claims in state court. *See Yellow Freight System, Inc. v. Donnelly,* —— U.S. ——, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990), where the Supreme Court held that state courts have concurrent jurisdiction to adjudicate Title VII claims. *See also Sweeney v. Hartz Mountain Corp.,* 319 Md. 440, 573 A.2d 32 (1990).

including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." Of course, Chappell would have to meet a burden of proof similar to that under Title VII to recover under § 215(a)(3) of the FLSA. *See, e.g., Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872 (2nd Cir.1988) (the allocation of burdens of proof in FLSA retaliation cases follows the three-step approach used in similar actions brought under Title VII); *Love v. Re/Max of America, Inc.,* 738 F.2d 383 (10th Cir.1984) (retaliatory discharge actions under Title VII and the FLSA are analyzed under the same legal standards); and *Caryk v. Coupe,* 663 F.Supp. 1243, 1253 (D.D.C.1987) ("In order to establish a prima facie case of retaliatory action under the FLSA, a plaintiff must demonstrate that (1) the employer was aware of plaintiff's participation in protected activity; (2) that an adverse employment action was taken against the plaintiff engaged in the protected activity; and (3) that the first two elements are related causally."). Such an action also may be brought in state court. 29 U.S.C. § 216(b).

■ Finally, as to Chappell's argument that the statutory remedies available to him are inadequate to fairly compensate him for his injury, we said in *Makovi, supra,* 316 Md. at 626, 561 A.2d 179, that they are exclusive and that to allow "full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." Neither federal statute allows for recovery of tort damages, and under state law the legislative history underlying enactment of § 11(e) of Article 49B demonstrates that the General Assembly rejected compensatory and punitive tort damages as remedies for violations of that section of the Maryland Fair Employment Practices Law. *See Makovi,* at 623–26, 561 A.2d 179.

JUDGMENT AFFIRMED, WITH COSTS.

ADKINS, Judge, Specially Assigned.

In *Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464, 473 (1981), we recognized "a cause of action for abusive discharge [of an employee at will] when the motivation for the discharge contravenes some clear mandate of public policy...." Later, we extended that doctrine to contractual employees because "recognition of the availability of this cause of action to all employees, at will and contractual, will foster the State's interest in deterring particularly reprehensible conduct." *Ewing v. Koppers Co.*, 312 Md. 45, 49, 537 A.2d 1173, 1175 (1988). But having advanced that far to protect employees against employer conduct that violated public policy, the Court then beat a sorry retreat. In *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), a divided Court decided that although a policy (against employment discrimination on the basis of gender) was unequivocally proclaimed by statute and a violation of it deemed so reprehensible that a limited administrative remedy was provided, nevertheless no abusive discharge remedy would lie on behalf of the victim of an employer who had flouted the statutory policy.

Today the majority applies *Makovi's* aberrational reasoning to affirm the dismissal of Robert Chappell's abusive discharge action. I dissented in *Makovi,* and continue to believe that that case was wrongly decided. Because a "former determination [that] is most evidently contrary to reason" should be overruled, 1 W. Blackstone, *Commentaries* * 69–70 (1898), I respectfully dissent. Moreover, as I read the applicable law, one portion of Chappell's action is viable even under the *Makovi* rationale.

Chappell's complaint alleges that he was a whistle-blower; he reported violations of anti-employment discrimination law and wage-hour law and because of that he was fired. Because I see the employment discrimination and wage-hour claims a bit differently, I shall discuss them separately.

## I.

Maryland Code (1957, 1986 Repl.Vol., 1989 Cum.Supp.), Article 49B, §§ 14–18 sets forth broad prohibitions against discrimination in employment. Among the unlawful employment practices there proscribed is discrimination by an employer "against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subtitle or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." Article 49B, § 16(f). The federal Civil Rights Act of 1964 contains similar provisions. 42 U.S.C. 2000e–3(a). Chappell in essence claims that one basis for his discharge violated the policy established by those statutes. Because limited administrative remedies are available to individuals so victimized, the majority denies Chappell any common law remedy. To do otherwise, it asserts, would upset " 'the balance between right and remedy struck by the Legislature in establishing the very policy relied upon.' " *Chappell v. Southern Maryland Hospital, Inc.*, 320 Md. 483, 497, 578 A.2d 766, 774 (1990) (quoting *Makovi*, 316 Md. at 626, 561 A.2d at 190).

The majority's view continues to be the one expressed in *Makovi:* "the remedies provided to eliminate prohibited discrimination form part of the anti-discrimination policy." 316 Md. at 621, 561 A.2d at 188. As a consequence, a discriminatory discharge does not violate the policy because of the existence of the self-contained limited remedy for "vindication" of the wrong.

This reasoning I find difficult to follow, and I expressed my disagreement with it in my dissent in *Makovi*, 316 Md. at 627–646, 561 A.2d at 190–200, with the support of Judges Eldridge and Cole. There is no need to restate at length those views. I venture to summarize them, however.

Nothing in the legislative history of the employment discrimination provisions of Article 49B suggests that the General Assembly engaged in any balancing between a

common law tort remedy (which did not exist when those provisions were first enacted) and an administrative remedy for violation of those prohibitions. Even the *Makovi* majority did not assert express or implied preemption as a basis for its decision. *Makovi*, 316 Md. at 605, 561 A.2d at 180. The adoption of limited administrative remedies for employment discrimination does not indicate a legislative intent to preclude a common law action in which much more comprehensive relief can be obtained. *Id.* at 639, 561 A.2d at 197 (Adkins, J., dissenting). This is especially true in light of authorities indicating that "Title VII (of the federal Civil Rights Act] contemplates the use of multiple remedies to cure instances of employment discrimination and that these remedies may include common law or statutory remedies sounding in contract or tort." *Id.* at 635, 561 A.2d at 195 [footnote omitted].

The legislature's administrative framework, in other words, is perfectly viable and sensible as an avenue of relief alternative to a tort action. There are circumstances under which a victim of discrimination might wish to pursue the administrative route instead of the tort route, *id.* at 643–644, 561 A.2d at 199, but a choice of remedies should not be precluded, absent clear legislative language to the contrary, because

> [t]he availability of multiple or parallel remedies may deter future discrimination and may assist in the combat against entrenched existing discriminatory practices in employment. The availability of the common law remedy supplements rather than hinders the goals of the statutes.

*Id.* at 644, 561 A.2d at 199. *And see* cases cited at 644–645, 561 A.2d at 199–200. The common law remedy ought to be available because the statutory remedies often

> fail to capture the personal nature of the injury done to a wrongfully discharged employe[e] as an individual and the remedies provided by the statutes [may] fail to appreciate the relevant dimensions of the problem. Reinstatement, back pay, and injunctions [may] vindicate the rights

of the victimized group without compensating the plaintiff for such personal injuries as anguish, physical symptoms of stress, a sense of degradation, and the cost of psychiatric care. [In such cases l]egal as well as equitable remedies are needed to make the plaintiff whole.

*Holien v. Sears, Roebuck and Co.*, 298 Or. 76, 97, 689 P.2d 1292, 1303–1304 (1984).

To say, as the majority effectively does, that our legislature did not understand these principles is to do it a disservice, and to frustrate to a considerable degree the very goals it sought to achieve when it enacted §§ 14–18 of Article 49B. I continue to believe it ironical that "the majority makes the statutes that establish the public policy, allegedly contravened here [ ] the means of depriving [the plaintiff] of the benefits of an abusive discharge action." *Makovi*, 316 Md. at 630, 561 A.2d at 192 (Adkins, J., dissenting). I would overrule *Makovi* and permit Chappell to go to trial on the abusive discharge claim based on violation of Maryland's public policy against employment discrimination.

## II.

As to the wage-hour law claim, § 215(a)(3) of the Federal Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et *seq.*, makes it unlawful

to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

The FLSA provides an administrative remedy for one who is harmed by violation of § 215(a)(3). The majority holds that the availability of this remedy precludes a common law abusive discharge action. *Chappell*, 320 Md. at 496, 578 A.2d at 773. For the reasons I have stated in Part I of this dissent, I disagree with this holding and would permit

Chappell to assert an abusive discharge claim for violation of this statutory public policy provision as well.

But the availability of a common law remedy for the State wage-hour violations is only one of many reasons to allow Chappell's action.

First, Maryland Code (1957, 1985 Repl.Vol., 1989 Supp.) Article 100, § 89(a), makes it a crime for an employer to pay less than the state minimum wage to an employee and § 90(a) authorizes a civil action by the employee to recover "the full amount of such wage rate, less any amount actually paid to such employee by the employer, and for costs and ... reasonable attorney's fees...." In other words, Article 100 establishes a State policy requiring payment of certain minimum wages, and creates a limited remedy for one claiming harm by reason of violation of the policy.

Second, Article 100, § 89(b) also penalizes

> [a]ny employer who discharges any employee because such employee has made any complaint to his employer, to the Commissioner [of the Division of Labor and Industry] or his authorized representative, that he has not been paid wages in accordance with the provisions of this subtitle, or because such employee has instituted any proceeding under or related to this subtitle, or because such employee has testified in any such proceeding....

This language, broadly read, might be construed as an anti-retaliatory or whistle-blower protection provision, although it certainly is not as specific as the federal language. But assuming it has the same general purpose, it does not operate to insulate the Hospital from an abusive discharge claim grounded on a firing provoked by Chappell's whistle-blowing about his employer's violation of Maryland wage-hour law.

Third, Article 100, § 82(e)(2), excepts from the definition of "employee" any "individual employed in a bona fide executive, administrative, or professional capacity." That was the nature of Chappell's employment. In other words,

he was not an "employee" within the meaning of Article 100, and so could not be protected by the "whistle-blower" provisions of § 89(b) or have the benefit of the remedy provided by § 90(a).

Chappell's complaint alleged that he was being forced to implement wage-hour policies in violation of Maryland law. One of the asserted reasons for his discharge was his refusal to follow management's directives to violate the law. Maryland law gives Chappell no statutory remedy for this abusive discharge, since he does not fall within the definition of "employee." Since there is no statutory remedy that Chappell may seek to redress the harm done him by reason of his discharge in violation of this legislatively established public policy, he should be able to sue for abusive discharge, even under the *Makovi* doctrine.

### III.

For the reasons stated here and more fully in the *Makovi* dissent, I would reverse the judgment of the Circuit Court for Prince George's County.

Judges ELDRIDGE and COLE have authorized me to say that they join in this dissent.