881 A.2d 1212

Wendy SHABAZZ

v.

BOB EVANS FARMS, INC., et al.

No. 976, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Sept. 2, 2005.

604

606

608

Nicholas Woodfield (R. Scott Oswald, The Employment Law Group, PLLC on the brief), Washington, D.C., for appellant.

Robert A. Harris (Stacia M. Jones on the brief), Columbus, OH, (Paul W. Mengel, III, Vorys, Sater, Seymour and Pease, LLP on the brief), Alexandria, VA, for appellee.

Argued before EYLER, DEBORAH S., ADKINS, RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Prince George's County, Wendy Shabazz filed a two-count complaint against Bob Evans Farms, Inc. ("Bob Evans"), and Brian Martin, an employee of Bob Evans, for employment discrimination based on race and

for retaliation for opposing an unlawful employment practice. After a hotly contested six-day trial, a jury found Bob Evans not liable on both counts and found Martin not liable for discrimination but liable for retaliation. It awarded "0" in compensatory damages and $85,000 in punitive damages.

A judgment was entered by the clerk in favor of Bob Evans and against Shabazz, for costs. A separate judgment was entered by the clerk in favor of Shabazz and against Martin for $85,000 and costs.

Martin filed a motion for judgment notwithstanding the verdict ("JNOV"), on the ground that the punitive damages award against him was not supported by a compensatory damages award. The court granted that motion. The court denied a post trial motion by Shabazz for "backpay" and to submit additional evidence on that issue. Finally, the court denied Shabazz's petition for attorney's fees.

In this appeal, Shabazz presents four questions for review, which we have reworded and reordered:

I. Did the trial court err by denying her motion to revise the judgment against Martin to add Bob Evans, so they would be jointly and severally liable?

II. Did the trial court err by denying her motion for backpay and to submit additional evidence about back-pay?

III. Did the trial court err by granting Martin's JNOV motion on the ground that punitive damages are not recoverable in Maryland unless actual damages have been awarded?

IV. Did the trial court err by denying her petition for attorney's fees and costs?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Bob Evans is an Ohio corporation that owns and operates family restaurants throughout the United States, including one on Crain Highway in Bowie.

On March 13, 2000, Shabazz was hired by Bob Evans to work as a server in the Bowie restaurant. Shabazz is a black person who is African–American. Soon after she started working at the Bowie restaurant, Martin was hired as its general manager. Martin is a black person who was born in Bermuda. Linda Hannah was the assistant manager of the Bowie restaurant at the relevant times. Hannah is white.

As a server, Shabazz was paid a modest hourly wage. She depended on tips to supplement her earnings. She worked primarily on the day shift. When Shabazz first was employed at the Bowie restaurant, the restaurant's policy was that each server was assigned to a particular station of tables for an entire shift. According to Shabazz, that policy enabled servers to develop regular customers, which in turn helped them increase their tips.

According to Shabazz, she and other African–American employees at the Bowie restaurant heard Martin make derogatory racial remarks about African–Americans, criticizing their speech and calling African–American males "thugs" and names that are racial epithets.

On March 3, 2001, the Bowie restaurant instituted a new station rotation policy, by which, during a given shift, servers were to move from station to station. A few weeks later, on March 16 or 17, 2001 (or perhaps on both—the record is not clear), Shabazz complained to Hannah that the station rotation policy was being implemented unfairly because white servers were not consistently being made to rotate stations but black servers were, and black servers were being moved to stations that were not desirable, and were being paired with black customers.

The next day, Hannah communicated Shabazz's complaint about the station rotation policy to Martin. Martin reacted by firing Shabazz on March 18, ostensibly on the basis that a regular customer had complained about her.

On March 20, 2001, Shabazz contacted Al Desiderio, the Area Director for Bob Evans, and protested her firing to him. The next day, Desiderio met with Shabazz and Martin. Sha-

bazz told Desiderio that she thought Martin had fired her in retaliation for her complaint about the station rotation policy. Desiderio announced at the meeting that Shabazz was being reinstated to her server position. In addition, he told Shabazz he would investigate her complaint about the station rotation policy.

Shabazz returned to work on March 22, 2001. A few days later, she called Desiderio and complained that her tables were being held open for extended periods, without customers being seated, which she thought was an act of retaliation by Martin.

Desiderio investigated Shabazz's new complaint and her earlier complaint about the station rotation policy. He concluded that there was no basis for either complaint. With respect to the station rotation policy, for example, his investigation showed that white and black servers all were being rotated and the stations were not assigned based on race.

According to Shabazz, over the next several months, Martin and his management staff, including Hannah, reduced her table assignments and deliberately did not assign her overtime, although it was available. Shabazz again complained to Desiderio, who on June 22, 2001, directed Martin to prepare an analysis of Shabazz's sales and tips.

On June 24, 2001, Martin completed a write-up in Shabazz's employment file. The write-up reprimanded Shabazz for going above Martin's head to complain to Desiderio, admonishing that "failure [to bring her issues of concern to Martin] will be considered as misconduct and will result in termination." Yet, Bob Evans had an "open door" employee complaint policy that permitted Shabazz to take her complaints directly to Desiderio.

On June 28, 2001, Martin wrote a report that Shabazz contended did not accurately reflect the computer-generated data about her sales and tips. The report included a comment that Shabazz ought to be fired for making complaints.

Accurate data about sales and tips in the Bowie restaurant did not reflect that there was any discriminatory practice with respect to seating arrangements. Furthermore, although Shabazz's overtime assignments decreased, the Bowie store generally had cut back on overtime for servers as a cost-saving mechanism.

On July 7, 2001, Martin blocked off Shabazz's station to accommodate a party of 30 that was assigned to her. In anticipation of the large party, Martin assigned Shabazz's regular customers to other servers. Apparently, the party of 30 either never arrived or arrived late. Shabazz complained to Martin, who was sitting at a table with a customer, that this assignment unfairly deprived her of customers. According to Shabazz, Martin said he was "just sick of" her complaining, and fired her, for "conduct unbecoming to a Bob Evans employee" (a violation of a company work rule). As Shabazz was gathering her belongings to leave, Martin said, "Yeah, I got you now, I finally got you, I've got a customer complaint and it's on you." He showed her a customer complaint form that had been filled in by the person he had been sitting with.

According to Martin, when Shabazz became angry over the customer seating assignment on July 7, she openly cursed in the restaurant and yelled at a long-time customer, who left the store in tears.

In the meantime, on April 9, Shabazz had made a complaint about the station rotation policy to the United States Equal Employment Opportunity Commission ("EEOC"). On June 25, she amended her EEOC charge to include "retaliation regarding [her] EEOC charge." On July 10, Shabazz filed an additional charge with the EEOC regarding her July 7 termination. Shabazz received a "Notice of Right to Sue" from the EEOC on August 9, 2001.[1]

---

1. The record discloses that Shabazz made a complaint to the Prince George's County Human Relations Commission on November 2, 2001, but reveals nothing about its disposition.

On January 24, 2002, in the Circuit Court for Prince George's County, Shabazz filed a two-count complaint against Bob Evans and Martin. In count I ("retaliation claim"), she alleged that the appellees had unlawfully retaliated against her on March 18, 2001, and again on July 7, 2001, by firing her for having made a complaint of discrimination on the basis of race, in violation of Md.Code (1957, 1998 Repl.Vol.), art. 49B, section 16(f), and section 2–185(a) of the Prince George's County Code. In count II ("employment discrimination claim"), she alleged that the restaurant's station rotation policy, as implemented, was an unlawful employment practice, because it discriminated against her with respect to her employment conditions and compensation, based on her race, in violation of Article 49B, section 16(a), and section 2–185(a) of the Prince George's County Code.

In both counts, Shabazz alleged that, as a proximate cause of the unlawful conduct, she had been

damaged in an amount to be determined at trial, including, but not limited to, the following: backpay, bonuses, tips, pension contributions and benefits, insurance contributions and benefits, fringe benefits, expenses and interest, front pay, costs of litigation, attorneys [sic] fees, emotional distress, and all other forms of economic, compensatory and punitive damages.

Shabazz sought "economic damages, compensatory damages, and punitive damages to be determined at trial, plus attorneys' fees, costs" and any other appropriate relief, and demanded a jury trial "for all issues proper to be so tried."

The case proceeded through discovery, with a final scheduled trial date of April 28, 2003. Shabazz added to her employment discrimination claim an allegation that Bob Evans and Martin had created a hostile work environment in which she was subjected to racial harassment.

On January 14, 2003, Shabazz filed a 42–page pretrial statement. In section VI, entitled "Relief Sought," she said:

Wendy is seeking economic damages of $65,000, which includes the cost of treatment for her emotional injuries.

Wendy is seeking compensatory damages of between $200,000 and $300,000 for pain and suffering; $190,000 in attorneys' fees and expenses to date; and between $350,000 and $500,000 in punitive damages.

Shabazz did not make any mention about backpay or about any sort of equitable relief. She did not ask to have issues separately decided by the jury and the court.

Trial commenced as scheduled and lasted for six days. Shabazz testified among other things that she was unemployed from July 7, 2001, until sometime in the beginning of August 2001. She did not introduce any evidence of lost earnings during that period, however.

At the close of the evidence, counsel for Shabazz informed the court that Shabazz was withdrawing her claim for economic damages, and was seeking compensatory damages solely for emotional pain and suffering.

The court's instructions addressed compensatory and punitive damages. At the outset of the punitive damages instruction, the court told the jurors, "Now, if you find for the plaintiff and award damages to compensate for the injuries suffered, you may go on to consider whether to make an award of punitive damages." No exceptions were taken to the instructions, by any party. There was no request for an instruction about nominal damages.

The court prepared a special verdict sheet and submitted it to counsel for their input. Counsel agreed to certain changes, which were adopted. The verdict sheet in final form set forth six questions on liability:

1. Do you find by a preponderance of the evidence that the Defendant, Bob Evans Farms, Inc., unlawfully discriminated against the Plaintiff because of her race?
 Yes——— No———

2. Do you find by a preponderance of the evidence that the Defendant, Bob Evans Farms, Inc., subjected the Plaintiff to a hostile work environment because of unlawful racial harassment?
 Yes——— No———

3. Do you find by a preponderance of the evidence that the Defendant, Bob Evans Farms, Inc., unlawfully discharged the Plaintiff in retaliation for her complaint of discriminatory conduct?

 Yes——— No———

4. Do you find by a preponderance of the evidence that the Defendant, Brian Martin, unlawfully discriminated against the Plaintiff because of her race?

 Yes——— No———

5. Do you find by a preponderance of the evidence that the Defendant, Brian Martin, subjected the Plaintiff to a hostile work environment because of unlawful racial harassment?

 Yes——— No———

6. Do you find by a preponderance of the evidence that the Defendant, Brian Martin, unlawfully discharged the Plaintiff in retaliation for her complaint of discriminatory conduct?

 Yes——— No———

The verdict sheet directed the jurors that if they answered "yes" to any of the six questions they were to proceed; it then set forth two damages questions:

7. What compensatory damages, if any, do you award the Plaintiff as a direct result of unlawful conduct on the part of the Defendants?

8. What punitive damages, if any, do you award the Plaintiff against the Defendants?

Shabazz did not ask the court to include a nominal damage question on the verdict sheet.

The jurors deliberated for about 4½ hours, after which they returned verdicts answering "no" to the first five questions on the special verdict form and "yes" to the sixth question. Thus, they found Bob Evans and Martin each not liable on the employment discrimination claims; found Bob Evans not liable for retaliation; and found Martin liable for retaliation.

Proceeding to the next question, the jurors awarded "0" in compensatory damages. Finally, they proceeded to the punitive damages question, and awarded "$85,000."

The last day of trial, and the day on which the verdicts were returned, was May 6, 2003. On May 13, the clerk entered judgments on the verdicts. As stated previously, a judgment was entered in favor of Bob Evans, and against Shabazz, for costs; and a separate judgment was entered in favor of Shabazz and against Martin, for $85,000 and costs. Two days later, on May 15, Shabazz filed a petition for attorneys' fees, under Article 49B, section 42(c).

On May 23, 2003, ten days after the entry of judgment against him, Martin filed a motion for JNOV, arguing that the punitive damages award was without legal foundation because the jury did not award compensatory damages.

Also on May 23, 17 days after the verdicts were returned, Shabazz filed a motion asking the court to order the appellees to pay "backpay" as a form of "make whole" equitable relief. She alleged that, from her termination date of July 7, 2001, until she gained other employment in early August 2001, she lost at least $323.68 in pay. There had been no evidence introduced at trial to support that assertion, however.

On May 28, 2003, Shabazz filed a motion to revise the judgment against Martin to reflect that Bob Evans was jointly and severally liable for the $85,000 punitive damages award, as Martin's employer.

The court scheduled a hearing on the motions for June 24, 2003.

On June 6, 2003, Shabazz filed a motion for leave to submit evidence at the June 24 hearing to support her motion for "backpay." Three days later, she filed an "evidentiary supplement" to her motion to revise judgment, consisting mostly of affidavits by her counsel.

The parties all filed oppositions to the motions of the others. On June 24, their counsel convened, as scheduled, and the court made an oral ruling from the bench.

The court denied Shabazz's motion for "backpay." The court commented that Shabazz could have pressed her claim for economic loss before the jury, but made the intentional decision to withdraw it from consideration. The court denied Shabazz's request to submit evidence about backpay, and did not allow her to proffer the evidence. As noted above, the court granted Martin's motion for JNOV, on the ground that Maryland law does not permit recovery of punitive damages in the absence of a predicate award of compensatory damages.

The court issued an order, on June 30, 2003, denying Shabazz's petition for attorneys' fees.

On July 8, 2003, the court issued an order granting Martin's motion for JNOV and striking the $85,000 punitive damages award against him. That same day, the clerk entered a judgment in favor of Martin and against Shabazz for costs. The new judgment did not accurately reflect the court's ruling, which was that Shabazz had prevailed on her retaliation claim against Martin but was not entitled to recover the damages awarded, as a matter of law. A judgment properly reflecting that ruling would have been in favor of Shabazz, for costs.

Shabazz filed a notice of appeal on July 15, 2003. That same day, she filed a motion to revise the judgment entered in favor of Martin, asserting that it should have been in her favor, for costs. She also filed a motion for reconsideration of the decision to grant Martin's JNOV motion. Finally, she filed a "proffer" of the evidence she had wanted to submit on the issue of backpay. The evidence consisted primarily of her own affidavit, in which she estimated that, from July 7 to the beginning of August 2001, she lost wages and tips totaling $1,173.68.

The appellees filed oppositions to Shabazz's motions.

On July 24, 2003, the clerk issued an "amended judgment" granting judgment in favor of Shabazz and against Martin, for costs. The clerk entered the judgment on the docket on August 22, 2003.

 On August 22, 2003, the court issued an order denying Shabazz's motion to revise judgment, on the ground that the clerk already had entered an "amended judgment" accurately reflecting the court's June 24 oral ruling; and denying Shabazz's motion for reconsideration. Shabazz did not file a second notice of appeal.[2]

## DISCUSSION

### I.

 Shabazz contends the trial court erred by denying, implicitly, her motion to revise the judgment in Martin's favor (which later was revised to be an amended judgment in her favor, against Martin, for costs) to include Bob Evans. Her argument is two-fold.

First, Shabazz maintains that the damages questions posed to the jury on the special verdict form (questions 7 and 8) spoke of "Defendants," in the plural; therefore, any damages

---

2. We have jurisdiction over this appeal notwithstanding that a second notice of appeal was not filed. Under Md.Code (1974, 2002 Repl.Vol.), section 12–301 of the Courts and Judicial Proceedings Article ("CJ"), this Court has jurisdiction over timely appeals taken from final judgments. A decision is a final judgment if it is intended by the court as an unqualified, final disposition of the matter in controversy, adjudicates or completes adjudication of all claims against all parties, and is properly entered in accordance with Md. Rule 2–601. *Short v. Short*, 136 Md.App. 570, 576–77, 766 A.2d 651 (2001). A timely filed JNOV motion, under Md. Rule 2–532, removes the finality of the judgment. *Waters v. Whiting*, 113 Md.App. 464, 471, 688 A.2d 459 (1997). The 30-day period for noting an appeal does not begin to run, therefore, until the motion is disposed of.

Here, Martin filed a timely JNOV motion. Accordingly, upon doing so, there was not a final disposition of the claim against him, and hence there was not a final judgment for purposes of appeal. On June 24, 2003, the court ruled orally, granting the JNOV motion. Pursuant to Rule 2–601(a), the clerk should have entered a judgment comporting with the court's ruling. Instead, on July 8, the clerk entered a judgment that was inconsistent with the court's ruling. At that point, however, there were judgments entered against both defendants. Shabazz filed her notice of appeal within a week thereafter. The change later made to the judgment entered with respect to Martin was clerical only, to conform to the ruling actually made by the court.

award should have been entered as judgments against both defendants.

As originally prepared by the court, the verdict sheet listed six liability questions, three for each defendant, and four damages questions, two for each defendant. Counsel for the appellees made two related suggestions for changing the verdict form. He suggested that the damages questions be condensed to two—so that the jurors would be asked to decide compensatory damages for "the Defendants," as a unit, and also to decide punitive damages for "the Defendants," as a unit. He further suggested that the six liability questions also be condensed, from six to three, so that each theory of liability would be decided for "the Defendants," as a unit.

Counsel for Shabazz agreed to the first suggested change. Hence, the verdict sheet was amended to combine what originally were four damages questions into the two questions, numbers seven and eight on the final verdict sheet. Counsel for Shabazz would not agree, however, to the second suggested change, which would have combined questions one through six into three questions, each addressing a liability theory against "the Defendants." Instead, he insisted that the six liability questions on the verdict sheet remain as drafted by the court.

The court made the suggested change to the verdict form that both counsel agreed to, but did not make the suggested change that counsel for Shabazz objected to. Counsel for both sides were asked by the court if they had any objection to the verdict sheet, in its final form, and neither did. Thus, as a consequence of Shabazz's lawyer's having prevailed in his position, the verdict sheet as submitted to the jurors directed them to separately decide the liability issues for each defendant but posed damages questions that referred to "the Defendants," regardless of whether both defendants, or only one, had been found liable. The use of the word "the Defendants" in questions seven and eight did not concern liability. Liability was addressed, for each defendant separately, in the jurors' answers to questions one through six.

Second, Shabazz argues that counsel for Bob Evans stipulated that Martin was acting within the scope of his employment when he terminated her and, therefore, the jury's finding that Martin was liable for retaliatory discharge meant that any judgment against Martin also should have been a judgment against Bob Evans, based on vicarious liability, as his employer. This argument contradicts the position Shabazz took below about the revisions to the verdict form, and otherwise is not supported by the record.

The record does not reflect that there was a stipulation of vicarious liability by counsel. To the contrary, the insistence by counsel for Shabazz that the verdict sheet call upon the jurors to decide the defendants' liability separately, and not as a unit, was the opposite of such a stipulation. The language counsel for Shabazz sought to keep in the verdict form, and that was kept in the form at his demand, allowed the jurors to find liability on the part of Martin *without finding liability, either vicarious or direct on the part of Bob Evans.* On appeal, Shabazz cannot now press a contrary position—that counsel had agreed that any finding of liability by Martin would result in a finding of vicarious liability by Bob Evans. If such an agreement had existed, counsel for Shabazz would not have taken the position he did about the verdict form.

In addition, the court's instructions to the jury, not objected to by either party, show that there was no such stipulation about vicarious liability. The court instructed the jurors on the factual issue of whether Martin was acting within the scope of his employment. After stating, "each defendant is entitled to a fair and separate consideration of that defendant's own defense," which was "not to be affected by [the jurors'] decision with respect to the other defendant[,]" the court further instructed that Bob Evans, as Martin's employer, was "responsible for injuries or damages caused by acts of employees or agents *if the acts causing the injuries or the damages were within the scope of the employment while Mr. Martin was acting as the employee of [Bob Evans] at the time [of] the acts* " complained about. (Emphasis added.)

The jurors thus were to decide, as the finders of fact, whether Martin was acting within the scope of his employment when he committed an act of unlawful employment practice, if at all. If the jurors found that Martin was acting within the scope of his employment, then Martin *and* Bob Evans were responsible. If he was not, then only he was responsible. It is clear from the findings in favor of Bob Evans in answer to the liability questions on the verdict sheet that the jurors resolved that factual issue against Shabazz. They found that Martin engaged in unlawful retaliation but Bob Evans did not, consistent with a factual finding that Martin was not acting within the scope of his employment when he committed the wrong.

The verdict returned by the jurors on the form approved by counsel answered the three liability questions for Bob Evans in the negative. The jurors found that Bob Evans did not discriminate against Shabazz because of her race, did not subject her to a hostile work environment, and did not discharge her in retaliation for her complaint of discriminatory conduct. The questions were broadly worded to cover all liability of Bob Evans, whether direct or vicarious. When the jurors found in Bob Evans's favor on liability, the court properly entered judgment in Bob Evans's favor. Shabazz's motion to revise, seeking to have Bob Evans added to the judgment against Martin, and thus held liable when the jurors had found no liability against it, was contrary to the verdict and inconsistent with the judgment properly entered in favor of Bob Evans. Accordingly, the court correctly denied the motion to revise.

## II.

Shabazz contends the trial court erred as a matter of law by denying her motion for "backpay." Relying on cases decided under Title VII of the federal Civil Rights Act of 1964, as amended, she argues that backpay is an equitable remedy and therefore properly was for the court, not the jury, to decide, upon the jury's deciding the retaliation claim against Martin. Shabazz further asserts that, because it was the court's task to

decide whether to award backpay, it was error for the court not to entertain the evidence she offered on that topic, at the June 24 hearing.

As explained above, Shabazz brought this civil action in two counts, both pursuant to sections 42 of article 49B of the Maryland Code, and Section 2–185(a) of the Prince George's County Code. An understanding of the state statutory anti-discrimination law scheme is necessary to our decision about the backpay issue.

Maryland's state anti-discrimination laws are set forth in article 49B of the Code. They establish the Commission on Human Relations and set forth its jurisdiction with regard to discrimination in housing, public accommodations, and employment. *Montgomery County v. Broadcast Equities, Inc.*, 360 Md. 438, 444, 758 A.2d 995 (2000).

Sections 14 through 18, entitled "Discrimination in Employment," constitute the Maryland Fair Employment Practices Act ("FEPA"). Section 16 prohibits discriminatory employment practices, including discharging a person from employment because of his race and retaliating against an employee who has made a complaint of unlawful discrimination. Art. 49B, § 16(a)(*l* ), (f). The definitions that apply to the FEPA, which are set forth in section 15, define "employer" to mean "a person engaged in an industry or business who has fifteen or more employees ... and any agent of such a person[.]" Art. 49B, § 15(b).

Unlike Title VII, article 49B does not create a general private cause of action in favor of victims of discrimination. The administrative enforcement process created by article 49B is the exclusive means for adjudicating an alleged unlawful employment practice in violation of section 16. *Md. Comm'n on Human Relations v. Downey Communications, Inc.*, 110 Md.App. 493, 542, 678 A.2d 55 (1996). *See also Chappell v. Southern Maryland Hosp., Inc.*, 320 Md. 483, 493, 578 A.2d 766 (1990) (holding that the existence of statutory remedies for discharge of employees in retaliation for reporting allegedly illegal discrimination claims or reporting viola-

tions of state and federal minimum wage law precluded tort claim for abusive discharge); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 626, 561 A.2d 179 (1989) (holding that common-law tort for abusive discharge on basis of unlawful employment discrimination based on gender will not lie when there is a specific statutory procedure and remedy to redress such conduct). *Cf. Molesworth v. Brandon,* 341 Md. 621, 636–37, 672 A.2d 608 (1996) (holding that common-law action for wrongful discharge based on gender discrimination will lie if the statutory remedy is not otherwise available).

■ The administrative enforcement remedy established by article 49B is set forth in sections 3, 4, 9A, and 10 through 12. Under these sections, the Commission has the power to receive complaints about alleged acts of discrimination (including unlawful employment practices), investigate, determine probable cause to support an allegation, make a complaint if there is probable cause and the alleged acts are not eliminated by agreement, and refer the matter for determination by a hearing officer, in a contested case hearing under the Administrative Procedure Act. *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 684–85, 818 A.2d 259 (2003).

■ Section 11, entitled "Hearing," provides at subsection (e) the relief the Commission is authorized to grant upon a finding by the hearing officer that the respondent engaged in a discriminatory act. If the respondent is charged with employment discrimination and is found to have engaged in an unlawful employment practice,

> the remedy may include, but is not limited to, reinstatement or hiring of employees, with or without backpay *(payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice),* or any other equitable relief that is deemed appropriate.

Art. 49B, § 11(e) (emphasis added). Thus, damages or other monetary relief may not be awarded, other than backpay,

when applicable. *Broadcast Equities, supra,* 360 Md. at 445, 758 A.2d 995.

The definition of "employer" in Title VII is virtually identical to the definition of that term in article 49B, section 15. "Employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person[.]" Title 42, section 2000e(b).[3]

▮▮▮▮ Likewise, the "backpay" language used in section 11(e) of article 49B is precisely the same as that used in the enforcement provision subchapter of Title VII, and that has been defined and interpreted by federal courts, in cases that are persuasive as to its meaning in our state statute. *See Chappell, supra,* 320 Md. at 494, 578 A.2d 766 (applying federal cases interpreting Title VII in analyzing claims under Article 49B); *Pope–Payton v. Realty Management Services, Inc.,* 149 Md.App. 393, 402, 815 A.2d 919 (2003) (same).[4] "Backpay" is the salary the complainant employee would have received but for the unlawful discriminatory acts, minus his actual interim earnings or the amounts he would have worked had he diligently sought other work. *See* Art. 49B, § 11(e).

▮▮▮▮ In a Title VII civil rights action, the court has broad discretion to grant equitable relief in order to make the injured person whole, that is, to place him in the position he would have been in absent the discriminatory actions. *Franks v. Bowman Transportation* Co., 424 U.S. 747, 763–64, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). An award of backpay is one such

---

**3.** Sections 2000e through 2000e–17 of Subchapter VI of Title 42 of the United States Code is entitled "Equal Employment Opportunities."

**4.** The language states, in relevant part, at section 2000e5(g)(1), "Enforcement provisions," that, in an action in federal court alleging an unlawful employment practice, if the court finds the respondent intentionally engaged or is engaging in such a practice, it may, *inter alia,* "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay (payable by the employer, the employment agency, or labor organization as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate."

type of equitable relief. *Hubbard v. E.P.A.,* 949 F.2d 453, 463 (D.C.Cir.1991). It is a form of restitution, the purpose of which is to restore the victim to his or her rightful place in the economic system. *U.S. v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 949 (10th Cir.1979); *Robinson v. Lorillard Corp.,* 444 F.2d 791, 802 (4th Cir.1971). Although backpay is a form of monetary relief, it is equitable in nature and is not an award of damages. *Curtis v. Loether,* 415 U.S. 189, 197, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Likewise, "backpay" under article 49B is restitutionary in nature. *Beretta U.S.A. Corp. v. Santos,* 122 Md.App. 168, 191, 712 A.2d 69 (1998), *rev'd on other grounds, Prince George's County v. Beretta USA Corp.,* 358 Md. 166, 747 A.2d 647 (2000).

 Until 1991, the remedies available under Title VII were limited to backpay and other forms of injunctive relief, such as reinstatement. That year, Title VII was amended to permit recovery of compensatory and punitive damages as well. 42 U.S.C. § 1981a. There has been no concomitant amendment to article 49B by the General Assembly. The relief available under the administrative procedures established in that statute does not include damages. *Makovi, supra,* 316 Md. at 625–26, 561 A.2d 179.

In 1992, however, the General Assembly created, in section 42 of article 49B, a new cause of action in the circuit courts for violation of the local anti-discrimination laws of Montgomery County. *Edwards Systems Technology v. Corbin,* 379 Md. 278, 292, 841 A.2d 845 (2004). That section was amended in 1993 to include Prince George's County and Howard County. Section 42, entitled "Civil actions for discriminatory acts," provides, in subsection (a):

> In Montgomery County, Prince George's County, and Howard County, in accordance with this subtitle, a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

It also provides, at subsection (c), that, in a civil action under section 42, "the court, in its discretion, may allow the prevailing party reasonable attorney's fees, expert witness fees, and costs."

The Prince George's County Code declares that "discriminatory practices" based on (among other things) race "are declared to be contrary to the public policy of the County." § 2-185(a). The Code further describes these "prohibitions" as being "substantially similar, but not necessarily identical, to prohibitions in federal and State law." § 2-185(c).

Shabazz's backpay argument against Martin is as follows. In her private cause of action, under section 42 of article 49B and section 2-185(c) of the Prince George's County Code, she was entitled to pursue backpay as a form of equitable relief; and because backpay is equitable relief, it was for the court, not the jury, to decide whether to award, once liability was found. Therefore, when she moved the court to order payment of backpay, after the jury returned its verdict against Martin, the court should have considered that request and permitted her to present additional evidence pertinent to it.

Even if, in a judicial civil action under section 42 for violation of a county's local anti-discrimination law, a plaintiff may seek equitable relief in the form of a "backpay" award, the trial court did not err in refusing to consider Shabazz's claim against Martin for backpay. As Shabazz herself argues, because the language in article 49B is patterned on Title VII, the cases interpreting the backpay remedy provision of Title VII are persuasive. *See Chappell, supra,* 320 Md. at 494, 578 A.2d 766; *Pope–Payton, supra,* 149 Md.App. at 402, 815 A.2d 919. The cases do not support her argument, however.

In Title VII cases, federal courts have addressed whether, under the controlling statutory language, supervisory co-employees can be held liable for backpay. As noted above, prior to the 1991 amendment to Title VII, backpay was the only form of monetary relief available. In 1982, the Ninth Circuit held that, because section 2000e(g) specifies that backpay awards are to be paid by the "employer," individual defen-

dants cannot be held liable for backpay. *Padway v. Palches,* 665 F.2d 965, 968 (9th Cir.1982).

In *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.1993), the Ninth Circuit reaffirmed its holding in *Padway,* rejecting an argument that the employer "and any agent of such a person" language in the definition of employer, in section 2000e(b), means that an individual who is an agent of the employer, such as a supervisor, can be held liable for backpay. The court interpreted the "and any agent" language simply to incorporate the doctrine of *respondeat superior. Id.* at 587–88. *Accord Johnson v. Northern Indiana Public Service Co.,* 844 F.Supp. 466, 469 (N.D.Ind.1994); *Ajaz v. Continental Airlines,* 156 F.R.D. 145, 148 (S.D.Tex.1994); *Canada v. Boyd Group, Inc.,* 809 F.Supp. 771, 781 (D.Nev.1992).

In *Weiss v. Coca–Cola Bottling Co.,* 772 F.Supp. 407, 411 (N.D.Ill.1991), the court explained that the equitable relief then permitted under Title VII—reinstatement and backpay— is the type of relief that an employer would be expected to provide in order to "make whole" an injured employee, but is not the type of relief that an individual who is not an employer would be expected to provide. *See also Newsome v. County of Santa Fe,* 922 F.Supp. 519, 523 (D.N.M.1996) (recognizing that backpay and reinstatement are "most naturally provided by employer-entities, rather than individuals") (citation and internal quotation marks omitted).

The Fifth Circuit has interpreted the "and any agent" definition of employer more liberally, to mean that a person is an employer if he or she serves in a supervisory position and exercises control over traditional employer functions such as hiring and firing; and therefore an individual defendant who was a supervising co-employee may be liable for backpay, but only in his or her official capacity. *Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990). Such a person may not be liable individually or personally. *Id.* at 227–28. See *also Barger v. State of Kansas,* 630 F.Supp. 88, 92 (D.Kan.1985) (holding that public official employees can be liable for backpay award in their official capacities, but cannot be held personally liable in

their individual capacities); *Sims v. Montgomery Co. Comm'n,* 544 F.Supp. 420, 427 (D.C.Ala.1982) (same).

The Fourth Circuit's view on this issue was somewhat unsettled until 1998. Originally, in 1989, it had held in *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *vacated in part,* 900 F.2d 27 (4th Cir.1990), that a private citizen properly can be held liable as an employer's "agent" under Title VII. In 1994, however, in *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510–11 (4th Cir.1994), the court interpreted the "employer" definition in the ADEA, which is virtually identical to the "employer" definition in Title VII, as meaning that a supervisory employee cannot be subject to personal liability under the ADEA. The court reasoned that an interpretation otherwise would produce the untenable result that an employer with less than 20 employees would not be subject to liability, because the ADEA would not apply at all, but a supervisory employee in charge of less than the minimum number of employees would be subject to liability. Adopting the reasoning underlying the Ninth Circuit's interpretation of "employer" in Title VII, the court concluded that the similar "and any agent" language in the ADEA merely is a statement of *respondeat superior* liability. *Id.* at 510.

In 1998, without any mention of *Paroline,* the Fourth Circuit applied its reasoning in *Birkbeck* in interpreting the meaning of "employer" under Title VII. The court held, in *Lissau v. Southern Food Service, Inc.,* 159 F.3d 177, 180–81 (4th Cir.1998), that the definition of "employer" in section 2000e(b) can only logically be read to mean that "supervisors are not liable in their individual capacities for Title VII violations."

■ Although there are conflicts in the federal case law, the federal courts are uniform in holding that the "employer" definition and the backpay relief provision in Title VII do not permit imposition of personal liability for backpay on a supervisory employee. The logic underlying these decisions, probably best explained by the court in *Weiss v. Coca–Cola Bottling, supra,* is that the restorative nature of backpay relief

means that it is relief that only the employer, and not other employees, can provide. From a policy standpoint, the decisions strike a sensible balance that advances the statutory goal of eliminating workplace discrimination without unduly hampering individual supervisors in making everyday hiring and firing decisions by exposing them to the risk of substantial personal liability.

In the case at bar, the only defendant found to have committed an act of unlawful employment discrimination was Martin, a supervisory employee. Under the Title VII caselaw that is persuasive, and that has interpreted in the federal context the same statutory backpay language that is used in article 49B, Martin could not be held personally liable to Shabazz for backpay. Bob Evans, the only defendant that possibly could have been held liable for backpay, was exonerated of wrongdoing by the jury. For these reasons, the trial court could not properly have awarded backpay against either of the appellees.

We note, in addition, that there is nothing in section 42 to support Shabazz's argument that she was entitled to seek backpay as equitable relief, and that she waived any such claim for backpay by her conduct in the case, in any event.

As we have explained, backpay is a form of relief that may be awarded administratively, under article 49B, section 11(e). In 1991, when section 1981a was amended to permit recovery of compensatory and punitive damages in Title VII cases, the amendments specifically removed backpay from the jury's consideration in those cases, so as to avoid double recovery, because section 2000e–5(g) already provided for backpay. "Thus, under the scheme established under Title VII, the court awards backpay, and the jury awards other compensatory damages." *Corti v. Storage Technology Corp.*, 304 F.3d 336, 344 (4th Cir.2002) (Niemeyer, J., concurring). The recovery scheme established in article 49B, which does not create a general cause of action for damages for violation of state anti-discrimination laws, and allows for administrative backpay, does not resemble the scheme established in Title

VII, however. The cause of action that is created in section 42, for violation of three local anti-employment discrimination laws, does not carve out backpay and disallow recovery of lost earnings from recovery as damages. There is nothing in the history of this case to indicate that an administrative award of backpay was or could be recovered. Thus, there was nothing to preclude Shabazz from going forward with her economic claim of lost earnings before the jury. As the trial court pointed out in denying the motion for backpay, Shabazz made the decision to withdraw that claim from the jury's consideration.

In any event, Shabazz did not favor the court with a request to grant equitable relief, and thus waived any such request. As noted above, Shabazz demanded a jury trial on her claims. In her 42–page pretrial statement, which included a section devoted to "Relief Sought," she said nothing about seeking equitable relief. She described the relief she was seeking at trial as "economic damages," "compensatory damages," "punitive damages," and attorneys' fees and expenses. During the trial, she said nothing about seeking equitable relief. Her first request for an award of equitable backpay relief was made 17 days after the conclusion of the trial. It appears to have been an afterthought.

With the merger of law and equity in 1984, in cases in which legal and equitable claims both are made, and trial by jury is requested, a jury will hear the case and decide common and legal issues, and the court will hear the case and decide equitable claims. *Mattingly v. Mattingly,* 92 Md.App. 248, 255, 607 A.2d 575 (1992). The conduct of a trial in which legal and equitable claims are joined is within the discretion of the court. When both claims involve similar fact situations, and the legal relief is the broader in terms of the evidence that may be adduced, the court may elect to proceed as if the trial were on the legal claim alone and, at the conclusion of the evidence, decide the equitable claim based on the relevant part of the evidence that was admitted. *See, e.g., Higgins v. Barnes,* 310 Md. 532, 552, 530 A.2d 724 (1987) (holding that

issues of deficient construction and the adjustment to which defendant was entitled should be submitted to a jury, after which the trial court should consider the equitable issues of reformation of the contract and the claim for specific performance); *Moshyedi v. Council of Unit Owners of Annapolis Road Medical Center Condominium,* 132 Md.App. 184, 196, 752 A.2d 279 (2000) (holding it was proper for the circuit court to withdraw claim for breach of fiduciary duty from the jury's consideration as it was an equitable one, allow the jury to reach a verdict on a legal issue of past due condominium fees, and then decide the claim sitting as a court in equity); *Upman v. Clarke,* 127 Md.App. 628, 631, 736 A.2d 380 (1999), *aff'd,* 359 Md. 32, 753 A.2d 4 (2000) (Appellants brought two claims, one seeking to have trust amendment set aside on ground of undue influence, the other a will caveat action, and the actions were consolidated in circuit court and tried as one before a jury and by the court. The will caveat action was decided by the jury; the court sitting in its equity capacity decided amendment action.). Of course, to exercise discretion about the conduct of the trial when legal and equitable claims are joined, the court at a minimum must be informed that legal and equitable claims both are being made.

That did not happen in this case. Here, Shabazz went to trial on claims of legal relief only. She did not seek equitable relief. Of course, because she did not seek equitable relief, the court did not have any reason to consider, or exercise discretion about, the conduct of a trial in which legal and equitable issues were joined, including whether to conduct a single trial on both claims. Instead, well after the conclusion of trial, Shabazz for the first time asked the court to grant her equitable relief, and sought leave to present evidence about "backpay," which had not been introduced at trial. In essence, after the only claims she had made had been decided in a jury trial, Shabazz asked for a second trial, before the court, on an equitable claim she had not raised or pursued previously. Under the circumstances, Shabazz waived her claim for equitable relief.

For all of these reasons, the trial court did not err in denying Shabazz's request for backpay and declining to entertain the evidence she offered, on June 24, on that topic.

## III.

Shabazz's next contention is that the trial court's decision to grant Martin's motion for judgment NOV was legally incorrect. Again patterning her argument on federal cases interpreting Title VII employment discrimination cases, she asserts that in the cause of action created by the General Assembly for violation of the local Prince George's County anti-discrimination law, codified in article 49B, section 42, the victim of discrimination need not recover an award of actual damages as a condition to recovering an award of punitive damages. Therefore, the court properly should have left the jury's award of punitive damages intact.

As noted above, in 1991, amendments to Title VII permitted victims of employment discrimination to sue not only for backpay and other equitable relief but also for compensatory and punitive damages. The amendments appear in section 1981a of Title 42, which is entitled, "Damages in cases of intentional discrimination in employment." Subparagraph (a)(1) of that statute recognizes a right of recovery of compensatory and punitive damages on the part of a complaining party against a respondent who has engaged in unlawful intentional discrimination.

Subparagraph (b), entitled "Compensatory and punitive damages," provides the standard for recovering punitive damages, *i.e.*, proof that "the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual"; excludes backpay and other equitable relief from compensatory damages, to avoid duplication, *see Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1352 (7th Cir.1995); and imposes limits on the total amount of compensatory damages (future pecuniary losses, emotional pain and suffering, and other non-pecuniary losses) and puni-

tive damages that may be awarded, for each complaining party. The damages limitations depend upon the size of the number of employees of the employer, and range from $50,000 to $300,000.

 The federal courts of appeal are in general agreement that, in a Title VII case, an award of backpay by the court is sufficient to sustain an award of punitive damages by a jury, when the jury has not awarded compensatory or nominal damages. *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 534 (6th Cir.2005); *EEOC v. W & O, Inc.*, 213 F.3d 600, 615 (11th Cir.2000); *Provencher v. CVS Pharmacy*, 145 F.3d 5, 12 (1st Cir.1998); *Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 670 n. 11 (7th Cir.1996); *Hennessy, supra*, 69 F.3d at 1352. The courts have reasoned that, although backpay is equitable relief, not damages, it is restoration of an actual loss to the plaintiff, and thus has a compensatory aspect to it. *See W & O, Inc., supra*, 213 F.3d at 615; *Hennessy, supra*, 69 F.3d at 1352.

Beyond that point, the courts of appeal are not in agreement. The First Circuit has held that, in the absence of a compensatory or nominal damages award, a punitive damages award cannot stand. *Kerr–Selgas v. American Airlines, Inc.*, 69 F.3d 1205, 1214–15 (1st Cir.1995). On appeal, the court recognized that a liability verdict finding intentional employment discrimination could support an award of nominal damages, which in turn could support an award of punitive damages. The court concluded, however, that such a liability finding does not compel an award of nominal damages; therefore, nominal damages must be sought by means of a jury instruction or post trial request for additur. Because nominal damages had not been sought in either fashion, the court vacated the punitive damages award. *Id.* at 1215.

The Eighth Circuit has held that a plaintiff who has prevailed on a race discrimination charge under 42 U.S.C. section 1981 is entitled to at least nominal damages. *Hicks v. Brown Group, Inc.*, 902 F.2d 630, 652–53 (8th Cir.1990), *vacated and remanded on other grounds*, 499 U.S. 914, 111 S.Ct. 1299, 113

L.Ed.2d 234 (1991). *See also Tolbert v. Queens College,* 242 F.3d 58, 74 (2nd Cir.2001) (same). That holding has been applied by the lower federal courts to Title VII discrimination cases. *See Wilson v. Brinker Int'l, Inc.,* 248 F.Supp.2d 856, 863 (D.Minn.2003) (imposing award of $1.00 in nominal damages in favor of plaintiff in Title VII case in which plaintiff recovered zero compensatory damages and $160,000 in punitive damages).

The Seventh Circuit and Second Circuit have further departed from the First Circuit's analysis, holding that a punitive damages award in a Title VII employment discrimination case can stand without an award of compensatory or nominal damages, or of backpay.

In *Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1010 (7th Cir.1998), the court observed that the language of section 1981a does not condition an award of punitive damages on an underlying award of compensatory damages and "[e]xtrastatutory requirements for recovery should not be invented." It reasoned that Title VII employment discrimination suits are controlled by the "federal common law of damages," which strives for uniformity when enforcing the Civil Rights Acts; and in suits under section 1983, punitive damages have been allowed to stand without an underlying compensatory damages award. *Id. See Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (holding that in section 1983 suit for violation of procedural due process rights the violation is actionable for nominal damages without proof of actual injury, because right to procedural due process is absolute and it is important to society that procedural due process be observed). The court also cited by analogy housing discrimination cases in which recovery of punitive damages has been permitted in favor of plaintiffs who experienced discrimination, but did not suffer actual loss. The court held that it was sufficient for the plaintiff to produce evidence of "*some* injury." *Timm, supra,* 137 F.3d at 1010.

Similarly, the Second Circuit in *Cush–Crawford v. Adchem Corp.,* 271 F.3d 352, 354 (2nd Cir.2001), held that "a Title VII

plaintiff may recover limited statutory punitive damages absent an award of either actual or nominal damages." The court reasoned that the language of section 1981a does not premise an award of punitive damages on an award of compensatory or nominal damages, or backpay; the common law of the various states is not uniform as to whether punitive damages must be supported by a compensatory damages award, a nominal damages award, proof of actual loss, or merely proof of injury; the damages limitations imposed in section 1981a(b) provide protection against unreasonable punitive damages awards by juries; and requiring an award of nominal damages is unnecessary because they "are generally no more than symbolic." *Id.* at 359.

The Fourth Circuit has not yet squarely decided these issues. In *Corti v. Storage Technology Corp., supra,* 304 F.3d at 341–42, the court affirmed a punitive damages award in a case in which there was an award of "0" compensatory damages, but over $400,000 in backpay. The court held that, "because the district court awarded [the plaintiff] back pay based on the jury's finding of liability," there was no error in allowing the punitive damages award to stand. *Id.* at 341–42. In a concurring opinion, Judge Niemeyer emphasized that the backpay award satisfied the "general rule that punitive damages must be supported by compensatory damages," *id.* at 344, and pointed out that, in housing discrimination cases, the court has held that punitive damages cannot be recovered without a foundation award of compensatory damages. *See People Helpers Foundation, Inc. v. Richmond,* 12 F.3d 1321, 1327 (4th Cir.1993).

We return to section 42 of article 49B, which is the statute creating the cause of action sued upon in this case. Section 42 was enacted by the General Assembly in 1992, in response to the decisions of the Court of Appeals in *McCrory Corp. v. Fowler,* 319 Md. 12, 570 A.2d 834 (1990), and *Sweeney v. Hartz Mountain Corp.,* 319 Md. 440, 573 A.2d 32 (1990). In *McCrory,* the Court held that Montgomery County did not have the power to create a private judicial cause of action for damages for violation of its anti-employment discrimination ordinance.

319 Md. at 24, 570 A.2d 834. The Montgomery County ordinance purported to authorize individuals to sue one another for damages for discriminatory practices prohibited by the ordinance. The Court held that the local anti-discrimination ordinance affected a matter of state wide concern and therefore did not qualify as a local law under Article XI–A of the Maryland Constitution. *Id.* Accordingly, the law was not within Montgomery County's power to enact.

In so holding, the Court reasoned that municipal corporations and local governments cannot by ordinance create private rights of action between third persons or enlarge the common law or statutory duties or liabilities of citizens among themselves. Only the General Assembly and the Court of Appeals have that power. *Id.*

Likewise, in *Sweeney,* the Court invalidated a Howard County local ordinance "authorizing an independent action in law or equity in the Circuit Court for Howard County," on the ground that it was not a local law and thus was enacted in violation of Article XI–A. 319 Md. at 444, 573 A.2d 32. *See also H.P. White Laboratory, Inc. v. Blackburn,* 372 Md. 160, 170–71, 812 A.2d 305 (2002)(holding void a Harford County ordinance authorizing a private cause of action in circuit court to recover damages for a violation of that county's anti-employment discrimination law).[5]

By chapter 555 of the Laws of 1992, the General Assembly enacted legislation, codified in section 42, authorizing private causes of action in the circuit court for a violation of the Montgomery County anti-employment discrimination ordinance. In 1993, the General Assembly amended section 42 to authorize such causes of action for violation of the anti-employment discrimination ordinances in Prince George's

---

5. Section 2–200 of the Prince George's County Code likewise purports to create a cause of action in circuit court for a discriminatory act in violation of the county's anti-employment discrimination law. In *Edwards Systems Technology, supra,* 379 Md. at 292 n. 6, 841 A.2d 845, the Court noted that, under the holdings in *McCrory* and *Sweeney,* that ordinance is void.

County and Howard County. 1993 Laws, ch. 152. The new cause of action thus created is in the circuit courts for "damages, injunctive relief, or other civil relief."

Unlike section 1981a, which expressly addresses punitive damages and imposes a standard for and limits upon recovering them, section 42 does not make any specific reference to punitive damages. Also, section 42 makes no reference to section 1981a, to any of the federal Title VII jurisprudence about punitive damages, or to the federal common law of damages. By contrast, section 41, which was enacted in 1992, when section 42 was passed in its original form (applying only to the Montgomery County ordinance), makes express reference to federal law, defining the words "prevailing party" by reference to 42 U.S.C. section 1988.

▇▇▇▇ Unless the General Assembly has stated otherwise, which it has not, the meaning of section 42, a state enactment, is to be interpreted by application of Maryland common law. That includes the Maryland common law of damages, and further, the Maryland common law of punitive damages, not the federal common law, the language of section 1981a, or the interpretations of that language by the federal courts which, as described above, are not uniform.[6]

▇▇▇▇▇ Under Maryland common law, punitive damages represent, in essence, a civil fine. *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966 (1982). *See also Darcars Motors of Silver Springs, Inc. v. Borzym,* 379 Md. 249, 263, 841 A.2d 828 (2004) ("Punitive damages are awarded '[b]ased upon the heinous nature of the defendant's tortious conduct,' and they serve the purpose of punishing the particular tortfeasor and deterring conduct similar to that which underlay the tort.") (internal citation omitted). The purpose of punitive damages is "to punish the wrongdoer and to deter such conduct by the

---

6. In 1997, the General Assembly enacted a statute, separately codified at section 43 of article 49B, authorizing in certain cases a private cause of action for violation of Baltimore County's anti-employment discrimination ordinance. Laws of 1997, ch. 348. Section 43 expressly *disallows* an award of punitive damages.

wrongdoer or others in the future." *Caldor, Inc. v. Bowden,* 330 Md. 632, 661, 625 A.2d 959 (1993). Punitive damages are not a means of recompensing the victim. *Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 34, 344 A.2d 180 (1975).

 It is a well settled proposition in Maryland law that a cause of action does not exist for punitive damages alone. *See, e.g., Philip Morris Inc. v. Angeletti,* 358 Md. 689, 773, 752 A.2d 200 (2000); *Shell Oil Co. v. Parker,* 265 Md. 631, 644, 291 A.2d 64 (1972). In *Schloss v. Silverman,* 172 Md. 632, 642, 192 A. 343 (1937), the Court observed, "[c]ompensation and punishment are different things, and it is generally held that punitive or exemplary damages cannot be recovered without proof of actual loss." (Internal citation omitted.) Hence, a necessary condition for the recovery of punitive damages is an underlying award of compensatory damages. *Philip Morris, supra,* 358 Md. at 773, 752 A.2d 200; *Caldor, supra,* 330 Md. at 662, 625 A.2d 959; *Rite Aid Corp. v. Lake Shore Investors,* 298 Md. 611, 626, 471 A.2d 735 (1984); *Carter v. Aramark Sports and Entertainment Services, Inc.,* 153 Md.App. 210, 253, 835 A.2d 262 (2003). More specifically, "there must be a compensatory damages award foundation for each count of a complaint that provides a basis for punitive damages." *Caldor, supra,* 330 Md. at 662, 625 A.2d 959 (emphasis omitted); *see also Thorne v. Contee,* 80 Md.App. 481, 502, 565 A.2d 102 (1989).

 In a proper case, a nominal damages award will support a punitive damages award. *Heinze v. Murphy,* 180 Md. 423, 429, 24 A.2d 917 (1942). In *Shell Oil, supra,* 265 Md. 631, 291 A.2d 64 the Court of Appeals held that an award of "nominal compensatory damages" will support an award of punitive damages. *Id.* at 644, 291 A.2d 64. Nominal compensatory damages are damages awarded when a compensable injury has been proven but it is impossible to calculate the actual loss that has been suffered. In that situation, the plaintiff has sustained actual harm. By contrast, an award of nominal damages that is not compensatory, *i.e.,* is made only upon a finding of a "technical invasion" of the plaintiff's rights,

when "in fact, no compensable injury was proved," will not support an award of punitive damages. *Id.*

The *Shell Oil* Court noted in its opinion that an "apparent exception" to the general rule that a cause of action does not exist for punitive damages alone "may be found in causes of action such as those for slander and or libel per se where general compensatory damages are presumed from the tortious act." *Id.* at 641 n. 6, 291 A.2d 64. In stating its holding, the Court referred to this exception a second time, commenting, "[w]e do not reach in this case the issue appearing in some cases that general compensatory damages might be presumed from the tortious act itself." *Id.* at 644, 291 A.2d 64.

In *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372 (D.Md. 1976), a suit alleging violations of common law trademark rights, unfair competition, and trademark infringement, a jury awarded the plaintiff $1.00 in compensatory damages and $3,000 in punitive damages. The plaintiff did not present proof of actual losses and expenses incurred as a result of the defendant's wrongful acts. The evidence showed, however, that the plaintiff had incurred substantial damages in an unspecified amount, which was difficult of precise proof. Applying the holding in *Shell Oil*, the court ruled that the nominal compensatory damages award supported the punitive damages award. 419 F.Supp. at 383.

In *IBEW, Local 1805 v. Mayo*, 281 Md. 475, 379 A.2d 1223 (1977), a defamation case, the jury awarded $1.00 in nominal compensatory damages and $5,000 in punitive damages. The plaintiff conceded at trial that he had not sustained any actual harm to his reputation from the defamatory statement. On appeal, the Court of Appeals rejected the defendant's argument that the First Amendment did not permit recovery of presumed and punitive damages. The Court held that, because the plaintiff had proven actual malice, under the standard set forth in *New York Times v. Sullivan*, 376 U.S. 254, 84

S.Ct. 710, 11 L.Ed.2d 686 (1964),[7] he could recover "both compensatory and punitive damages absent proof of actual damages of any kind," without offending the First Amendment. 281 Md. at 481–82, 379 A.2d 1223 The parties did not raise, and the Court did not address, the question whether the damages award comported with Maryland state common law of damages.

In *Hearst Corp. v. Hughes,* 297 Md. 112, 125–26, 466 A.2d 486 (1983), another defamation case, the Court held that when the statement at issue is defamatory per se and the defendant's conduct has met the standard for constitutional malice set forth in *New York Times v. Sullivan, supra,* damages are presumed; accordingly, a fact-finder may award general damages for the false words even in the absence of proof of harm. *See also Shapiro v. Massengill,* 105 Md.App. 743, 774, 661 A.2d 202 (1995).

Finally, in *Lake Shore, supra,* 298 Md. at 626, 471 A.2d 735, the Court held that special damages were not a required element of the tort of intentional interference with contract, and that an award of general damages in nominal amount was a compensatory damages award sufficient to sustain the punitive damages award. There, the trial court ruled that damages must be measured under the contractual "benefit of the bargain" rule. After the plaintiff failed to prove any damages under this measure, the trial court granted the request of the defendant for a directed verdict. The Court granted a new trial on the grounds that the trial court incorrectly limited evidence pertaining to damages. The Court held that, to recover punitive damages for intentional interference with contract, the plaintiff needed to recover at least nominal compensatory damages and prove that the tortious act was committed with actual malice. 298 Md. at 626–27, 471 A.2d 735.

---

**7.** In *Sullivan,* the Supreme Court held that public officials must prove that defamatory falsehoods relating to their official conduct were made with "actual malice," *i.e.,* with knowledge that statements were false or made with reckless disregard of the truth. 376 U.S. at 279–80, 84 S.Ct. 710.

 In the case at bar, the thrust of Shabazz's argument about punitive damages is that, because discrimination is wrongful conduct that article 49B and section 2–185 of the Prince George's County Code seek to eradicate and punish, the jury's finding of liability against Martin was, in and of itself, sufficient to support the punitive damages award against him, without an award of compensatory or even nominal compensatory damages. She does not cite any Maryland caselaw to support this argument. Rather, she relies entirely on the Title VII cases we have discussed, asserting that we should presume that the General Assembly enacted section 42 with those cases in mind.

As we already have explained, however, there is nothing to indicate that the General Assembly intended to incorporate Title VII jurisprudence about punitive damages in employment discrimination cases in place of the Maryland common law of punitive damages when it created a private cause of action for damages for violation of the Montgomery County, Prince George's County, and Howard County local anti-employment discrimination ordinances. Also, Title VII jurisprudence about punitive damages has developed based on judicial interpretations of language in section 1981a that expressly allows for recovery of punitive damages; other language in section 1981a that places a limitation on the amount of damages, both compensatory and punitive, that may be awarded in a Title VII case; and the federal common law of damages, which is not the same as Maryland common law. None of these considerations apply to article 49B generally, or to section 42 in particular. We must presume that, in creating the private cause of action that is codified at section 42, the General Assembly intended that the Maryland common law of damages would control.

 We have found no case applying the Maryland common law of damages that has upheld a punitive damages award that was not supported at least by an award of nominal compensatory damages. Here, Shabazz did not ask for a jury instruction on nominal damages. She did not ask to have a

nominal damages award option included in the special verdict sheet. She did not object to the punitive damages jury instruction that was actually given that, consistent with Maryland common law of damages, conditioned any punitive damages award on a predicate award of compensatory damages.[8] Neither in her own post trial motions nor in response to the appellees' post trial motions did she ask the court to enter a nominal damages award.[9]

The standard of review for a decision to grant a motion for JNOV is whether the decision was legally incorrect. Ordinarily, a motion for JNOV tests the legal sufficiency of the evidence. *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 325, 389 A.2d 887 (1978); *Nationwide Mut. Ins. Co. v. Anderson*, 160 Md.App. 348, 356, 864 A.2d 201 (2004). In the present case, however, the trial court

---

8. Again, the instruction was, "Now, if you find for the plaintiff and award damages to compensate for the injuries suffered, you may go on to consider whether to make an award of punitive damages."

9. In her reply brief, for the first time, Shabazz raises the issue of inconsistency and asks that, if this Court does not otherwise agree with her position on the issues she has raised, we grant her a new trial. This argument was not raised or decided below, as Shabazz did not file a motion for a new trial.

 We note, moreover, that the verdict was not inconsistent. The jurors were instructed, without objection, to consider punitive damages only if they awarded compensatory damages. The jurors awarded "0" in compensatory damages and then, contrary to the court's instruction, also awarded punitive damages. Under Maryland law, the punitive damages award, having been made without the necessary compensatory damages predicate, was legally improper, and could not stand. *See Montgomery Ward & Co., Inc. v. Keulemans*, 275 Md. 441, 446, 340 A.2d 705 (1975) ("the rule of our cases is clear that there must be an award of compensatory damage, at least in nominal amount, for an award of punitive damages to be allowed to stand"); *Heinze, supra*, 180 Md. at 429, 24 A.2d 917 ("A judgment on a verdict awarding punitive damages but no actual damages has been held error." (citation omitted)). That is not the same as being inconsistent. *See Frey v. Alldata Corp.*, 895 F.Supp. 221, 224 (E.D.Wis.1995) (noting that, when jury awarded punitive damages and zero compensatory damages, after being instructed to only answer punitive damages question on verdict sheet if it awarded compensatory damages, "the answer on punitive damages [was] superfluous, it [was] legally impossible, not logically inconsistent").

did not decide the motion for JNOV on the legal sufficiency of the evidence presented at trial, but rather on the basis that an award of compensatory damages was a necessary predicate to an award of punitive damages. Thus, in reviewing the trial court's decision to grant the motion, we must determine whether the trial court's decision on the law of punitive damages was correct. The trial court ruled that, under the Maryland law of damages, once the jury found that Shabazz had sustained "0" in compensatory damages, it could not make an award of punitive damages. For the reasons we have explained, that decision was legally correct under the Maryland common law of damages, which applies to this case.

## IV.

Finally, Shabazz contends the trial court erred in denying her petition for attorneys' fees. Section 42 provides that, "[i]n a civil action under this section, the court, in its discretion, may allow the prevailing party reasonable attorneys' fees, expert witness fees, and costs."

Shabazz's argument on this issue hinges upon our resolution of the other issues she has raised. She argues that, but for the errors she maintains the trial court committed by not entering judgment against Bob Evans and by granting the motion for JNOV filed by Martin, "she would have received attorneys' fees and costs as the prevailing party whose ends were accomplished as a result of the litigation." Shabazz does not argue that, in the absence of error on the part of the trial court, the trial court erred or abused its discretion in denying her fee petition.

For the reasons given, we have concluded that the trial court did not err in its rulings in this case. Accordingly, we also reject Shabazz's assertion that the trial court erred or abused its discretion in denying her petition for attorneys' fees.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**